INTERSTATE COMMERCE COMMIS-
SION, Plaintiff,

v.

ARPEL, INC., and Leonard Arnold
Peluso, Defendants.

No. 11096–M–Civ.

United States District Court
S. D. Florida.
Aug. 30, 1962.

Raymond A. Cunningham, Atlanta, Ga., for plaintiff.

Lawrence I. Hollander, Miami, Fla., for defendants.

Shutts, Bowen, Simmons, Prevatt & Boureau, and Edward F. Boardman, U. S. Atty., Miami, Fla., for intervenors.

CHOATE, District Judge.

This cause having come on for trial by the Court, Raymond A. Cunningham, Attorney for Plaintiff, Interstate Commerce Commission and Laurence I. Hollander, Attorney for Defendants and the Court having duly considered the complaint of the Plaintiff, answer by Defendant, stipulations filed with the Court, the evidence and the representations of fact of the parties hereto, the Court now makes and enters the following:

### Findings of Fact

#### I

This is an action by the Interstate Commerce Commission brought under the provisions of Sections 204(a) (6) and 222(b) of Part II of the Interstate Commerce Act (49 U.S.Code, §§ 304(a) (6) and 322(b), and Section 2 of the Elkins Act (49 U.S.Code, § 42) and under the general laws and rules relative to suits in equity arising under the Constitution and laws of the United States. By its complaint, the plaintiff seeks to enjoin the defendants, Arpel, Inc., and Leonard Arnold Peluso, from transporting property by motor vehicle in interstate commerce, over or upon public highways for the general public for compensation either as a common or contract carrier in interstate commerce until such time as said defendant or defendants have obtained from the Commission the necessary operating authority to engage in such transportation.

#### II

That the defendant, Arpel, Inc., was and is a corporation duly organized and existing and by virtue of the laws of the State of Florida, with its principal place of business in Miami, Florida, was and is engaged in the transportation of prop-

erty in interstate commerce by motor vehicle on public highways, between points in the States of Florida, New York, Pennsylvania, Mississippi, Michigan, New Jersey, Illinois, Tennessee, and other states by means of the arrangements described in Paragraph IV hereof. That defendants were and are operating in the Southern District of Florida, and within the jurisdiction of this Court, and subject to the provisions of Part II of the Interstate Commerce Act (Title 49, Chapter 8, U.S.Code).

### III

That the defendant, Leonard Arnold Peluso, has been and is President of Arpel, Inc., and has been and is aiding and assisting in the motor carrier operations described in the preceding paragraph.

### IV

That the defendants, Arpel, Inc. and Leonard Arnold Peluso, under the guise of a truck leasing business, have transported since November 11, 1960, shipments of tractor shovels, plastic materials, exhaust tail pipes, iron and steel auto parts, magazines, chemicals, glazing units, aluminum window frames and panels, and other commodities subject to economic regulation from and to companies located in Florida and the other states named in Paragraph II hereof. That the motor vehicle equipment used to perform the transportation was and is owned by defendants.

### V

That the uncontroverted evidence established the method of operation which was patterned as follows:

The shipper called defendants to notify that a shipment was available for their company which was to be delivered or picked up in the Miami area. The details of the shipment including the commodity to be transported, the origin, the destination, and the desired date of delivery were usually conveyed to the defendants at that time. If defendants had a motor vehicle and driver in the vicinity of the origin point of the shipment which had not already been promised, the motor vehicle was assigned to the shipper and the driver on the motor vehicle was "recommended" to the shipper. The driver so "recommended" for the transportation invariably transported each shipment. If the defendants did not have a motor vehicle and driver in the vicinity of the origin point, various telephone calls were made by defendants to obtain a shipment of agricultural commodities or other cargo to be transported to a point near the origin point designated.

After negotiating a transportation cost based on a rate of 24 to 26 cents per mile for the motor vehicle and 6 cents per mile for the driver, the shippers were advised of estimated date of delivery of the shipment and the name of the driver who would transport, papers were mailed or delivered in person to shippers by defendants which usually consisted of invoices, truck rental agreements and a request for drivers pay. Shippers had no contact with drivers other than at the time of pickup or delivery of a shipment. Defendants furnished drivers operating expenses. No doctor's certificates were maintained on file either by defendants or shippers. Drivers sometimes turned in drivers' daily logs to shippers but the testimony failed to reveal a single instance wherein the shippers instructed the drivers to do so. Information as to the drivers' social security number and number of dependents was listed on the driver's request for pay mailed or delivered to the shippers by defendants. Defendants paid drivers, while transporting agricultural commodities, either at the rate of 6 cents per mile or 20% of the gross revenue of the transportation charges received by defendants. Property damage and public liability insurance were supplied by Arpel, Inc. in the amounts of 100/300/25,000. Gas, oil, tires, repairs, maintenance and all operating expenses with the exception of highway toll charges were supplied by Arpel, Inc.

## VI

In addition to the motor vehicle equipment owned by defendants they also leased equipment from at least one driver. Some of the motor vehicle equipment leased from said driver was not operated by its owner. The driver received 14 cents per mile for use of his motor vehicle equipment which was in addition to compensation received for driving.

## VII

Most of the shipments transported from the Miami area consisted of agricultural commodities and the inbound shipments consisted of regulated commodities. If a driver did not have knowledge of the shipment to be returned to the Miami area at the time of departure, he telephoned defendants, collect, for further instructions after delivery of the outbound shipment.

## VIII

That at the time the above described transportation services were performed in interstate commerce, there was not in force and there is not now in force with respect to Arpel, Inc. or Leonard Arnold Peluso, a Certificate of Public Convenience and Necessity, or a permit, or any other form of authority issued by the Interstate Commerce Commission, authorizing said transportation.

## IX

That, unless enjoined and restrained by this court from doing so, it appears likely, on the basis of prior acts and those above described, that the defendants will continue to engage in such practices.

### Conclusions of Law

From the foregoing facts and evidence presented, the Court concludes: That this court has jurisdiction of the parties and the subject matter of this action.

In defining a particular motor carrier operation, it is the substance, rather than the form, which is of importance. Georgia Truck System, Inc. v. Interstate Commerce Commission, 123 F.2d 210. Recently the Supreme Court, in United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360, reaffirmed this long standing principle and gave reasons for the method of interpretation in the following language:

"Because the definitions must, if they are to serve their purpose, impose practical limitations upon unregulated competition in a regulated industry, they are to be interpreted in a manner which transcends the merely formal. From the outset the Commission has correctly interpreted them as importing that a purported private carrier who hires the instrumentalities of transportation from another must—if he is not to utilize a licensed carrier—assume in significant measure the characteristic burdens of the transportation business."

The defendants herein have in fact retained the identifying characteristics of a "for hire" motor carrier throughout their operation. The issuance of checks to the drivers by shippers and consignees and the "trip lease" or "spot lease" agreements executed were but a specious salutation to the regulations applicable to defendants interstate motor carrier business.

Furthermore, no support for defendant's claim of private carriage can be found in the premise that some of the shipments consisted of agricultural commodities, exempt from economic regulation. Defendants, by coordinating the activities of drivers, shippers, and consignees, by local and long distance telephone calls, were clearly the common denominator for each of the separate shipments, and have been, in fact, operating as a for hire motor carrier in interstate commerce.

The following quotation is from Motor Haulage v. United States, 70 F.Supp. 17, 22 affirmed 331 U.S. 784, 67 S.Ct. 1205, 91 L.Ed. 1815:

" * * * the courts have rejected the idea that any particular incident

of the legal relationship determines who is the employer of a driver. Irwin v. Klein, 1936, 271 N.Y. 477, 3 N.E.2d 601; Rumberger v. Welch, 2 C.C.A.1942, 131 F.2d 384.)"

It was also stated in Ellegood v. Brashear Freight Lines, 236 Mo.App. 971, 162 S.W.2d 628:

> "The cases hold that while payment of wages is a circumstance which may aid in determining who is the employer, such payment of itself is insufficient to establish that fact. It is merely useful in determining who has the power of control, which latter is the controlling consideration."

Most of the contacts with the drivers by shippers and consignees were for the purpose of payment only of a sum designated by defendants after delivery of a shipment. Occasionally the shipper would be contacted by a driver at the time a shipment was picked up but even under those circumstances defendants had already made arrangements between the driver and shipper prior to the driver's arrival. The relationship between the drivers and defendants was in substance that of employer and employee with defendants delivering ancillary instructions as to the method of payment of the drivers.

A description of the operation here needs no fragmentary construction. Defendants have retained direction, control, and responsibility, for the motor vehicles and drivers at all times. In addition they have supplied incidental services normally attributed to "for hire" transportation. Their customers have been offered and delivered transportation at a fixed rate of compensation without assumption of financial risk or the characteristic burdens of a transportation business. Under these circumstances it is concluded that the business of defendants is that of a "for hire" motor carrier shallowly cloaked with a subterfuge arrangement purporting to represent private carriage.

 It is also concluded that the transportation by defendants is subject to Part II of the Interstate Commerce Act; and that the aforesaid acts of the defendants were and are in violation of Sections 206(a), 209(a), and 222(b) of Part II of the Act (49 U.S.C.: §§ 306(a), 309(a), and 322(b)) and as such are subject to be enjoined by this Court.

The injunction as prayed for in complaint of plaintiff is hereby entered accordingly.