**P. SALDUTTI & SON, INC., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**

Civ. A. No. 956–61.

United States District Court
D. New Jersey.

Nov. 5, 1962.

Ernest Brita, Millburn, N. J., Morton E. Kiel, New York City, for plaintiff.

Lee Loevinger, Asst. Atty. Gen., David M. Satz, Jr., U. S. Atty., John H. D. Wigger, Atty. Dept. of Justice, for the United States.

Robert W. Ginnane, Gen. Counsel, Betty Jo Christian, Washington, D. C., for Interstate Commerce Commission.

Before McLAUGHLIN, Circuit Judge, MADDEN, Chief District Judge, and AUGELLI, District Judge.

AUGELLI, District Judge.

In this action, plaintiff P. Saldutti & Son, Inc. ("Saldutti"), seeks to set aside an order of the Interstate Commerce Commission ("Commission"), which order determined that Saldutti's contract carrier permit should be revoked and a common carrier certificate issued in lieu thereof, and also delineated the scope of Saldutti's operating authority as a common carrier under said certificate.

The order under attack stems from a conversion proceeding initiated by the Commission under section 212(c) of the Interstate Commerce Act ("Act"), 49 U.S.C.A. § 312(c), to determine whether Saldutti's operations conformed to the amended definition of a contract carrier by motor vehicle contained in section 203(a) (15) of the Act, 49 U.S.C.A. § 303 (a) (15)[1].

---

1. Both the enactment of section 212(c) and the amendment of section 203(a) (15) became effective August 22, 1957. Prior to the amendment of section 203 (a) (15) a "contract carrier by motor vehicle" was defined to mean "any person which, under individual contracts or agreements, engages in the transportation * * * by motor vehicle of passengers or property in interstate or foreign commerce for compensation."

Section 203(a) (15) of the Act amended the definition of a "contract carrier by motor vehicle" to mean "any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation * * *, under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Section 212(c) of the Act directed the Commission to examine each outstanding permit "and after notice and hearing revoke a permit and issue in lieu thereof a certificate of public convenience and necessity, if it finds, first, that any person holding a permit whose operations on the date this subsection takes effect [August 22, 1957] do not conform with the definition of a contract carrier in section 203 (a) (15) as in force on and after the date this subsection takes effect [August 22, 1957]; second, are those of a common carrier; and, third, are otherwise lawful. Such certificate so issued shall authorize the transportation, as a common carrier, of the same commodities between the same points or within the same territory as authorized in the permit."

For a number of years prior to August 22, 1957, Saldutti was the holder of a permit issued to it by the Commission which authorized Saldutti, as a contract carrier by motor vehicle, to transport certain commodities, over irregular routes, within the territorial limits of its permit.

On January 3, 1959, the Commission, on its own motion, and acting pursuant to Section 212(c) of the Act, instituted a proceeding to determine whether Saldutti's contract carrier permit should be revoked and a common carrier certificate, authorizing the transportation of the same commodities between the same points and within the same territory as

previously authorized by the permit, should be issued in lieu thereof. In connection with that proceeding, and in compliance with a Commission requirement, Saldutti completed and filed with the Commission a questionnaire in which Saldutti set forth certain details concerning its operations and therein expressed the opinion that it was a "contract carrier by motor vehicle" under the amended definition of that term.

Subsequent to the filing of the questionnaire, and on June 7, 1960, a hearing was held on the issue of Saldutti's status. The only witness who appeared and testified in behalf of Saldutti was Melvin Chirls, Saldutti's president and chief executive officer, who had familiarity with the entire operation and business of his company. Upon a consideration of all the evidence adduced at the hearing, the Examiner found, as appears from his recommended report and order which was served on August 22, 1960, that Saldutti's operations on the critical date of August 22, 1957, and thereafter, did not conform with the amended definition of a contract carrier; that such operations were those of a common carrier, and were otherwise lawful; and that upon compliance by Saldutti with certain conditions, its permit should be revoked and a common carrier certificate of public convenience and necessity issued in lieu thereof. The Examiner also recommended that certain changes be made in the language of Saldutti's existing permit which, when carried over into the certificate proposed to be issued, would establish the scope of Saldutti's authority as a common carrier thereunder.

On October 3, 1960, Saldutti filed exceptions to the Examiner's recommended report and order. It contended the Examiner erred in finding that Saldutti's operations did not conform to the amended definition of a contract carrier by motor vehicle, but that even if the Examiner's conclusion was correct on this phase of the case, the Examiner nevertheless erred in recasting the scope and extent of Saldutti's operating authority as a common carrier.

The exceptions were considered by Division 1 of the Commission. It decided the matter on February 20, 1961, and filed a report containing its findings of fact and conclusions thereon. After an independent study of the record, the Division agreed with the Examiner that the operations of Saldutti were those of a common carrier. With respect to the scope of Saldutti's authority as delineated by the Examiner in the proposed certificate of public convenience and necessity to be issued to Saldutti in lieu of its permit, the Division also agreed with the language changes suggested by the Examiner, except for a modification which it made in one of the paragraphs of the certificate.

On March 30, 1961, Saldutti filed a petition for reconsideration by the entire Commission of the Division 1 order of February 20, 1961. No objection was made by Saldutti in that petition regarding its conversion from a contract to a common carrier. The objections were confined to the scope of the authority contained in the common carrier certificate. Reconsideration was denied by the entire Commission on July 13, 1961, "for the reason that the findings of Division 1 in its report and order of February 20, 1961, are in accordance with the evidence and the applicable law."

The complaint in this case was filed on November 17, 1961. Pending the final outcome of this litigation the Commission, on its own motion, has postponed the effective date of its conversion order of February 20, 1961.

We shall first consider the Commission's determination that Saldutti's operations did not conform to the amended definition of a contract carrier.

The problem which confronted the Commission in dealing with contract carriers by motor vehicle prior to 1957, and the considerations which led to the amendment of section 203(a) (15) of the Act, and the addition of section 212(c) thereto, are set forth in 1957 U.S.Code Cong. and Admin.News, pp. 1599–1605. A perusal of this legislative history clearly evinces a Congressional intent to preserve the basic distinctions between common and contract carriers and to overcome the effect of the decision in United States v. Contract Steel Carriers, Inc., 350 U.S. 409, 76 S.Ct. 461, 100 L. Ed. 482 (1956). In that case, the Supreme Court, after noting that the Commission found that Contract Steel Carriers, Inc. had not sufficiently specialized its operation, concluded that if such specialization was a factor, it was satisfied in that case since the carrier hauled only strictly limited types of steel products under individual and continuing contractual agreements with a comparatively small number of shippers throughout a large area. The Supreme Court also held that the fact that Contract Steel Carriers, Inc. had actively solicited business within the bounds of its license, did not support a finding that the carrier was "holding itself out to the general public", and stated that a contract carrier is free to aggressively search for new business within the limits of its license.

The Contract Steel Carriers case pointed up the difficulties that had been facing the Commission in trying to regulate the operations of contract carriers. The Commission lacked power to limit the number of contracts under which a contract carrier could operate. While specialization of service was a factor considered by the Commission in passing upon an application for a contract carrier permit, the Commission could not prevent a contract carrier from later adding contracts for unspecialized services within the limits of its permit. As a result of these limitations on the power of the Commission, the operations of some contract carriers became more and more like those of common carriers.

The 1957 amendment to section 203(a) (15) of the Act established three criteria for determining whether a carrier's operations are those of a contract carrier. The basic test is transportation "under continuing contracts with one person or a limited number of persons". All contract carriers must conform to this test. The remaining criteria, "for the furnish-

ing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served", and "for the furnishing of transportation services designed to meet the distinct need of each individual customer," are stated in the disjunctive and compliance with either, coupled with compliance with the basic test, will be sufficient to bring a carrier within the statutory definition of a contract carrier.

█ It will be noted that section 203 (a) (15) does not specify what shall constitute a "limited number of persons". It is for the Commission to determine, under the facts of each case, whether a carrier serves a limited number of shippers. If the findings of the Commission on this issue are supported by substantial evidence and in accord with applicable law, this Court will not disturb them. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L. Ed. 821 (1946); Ontario Freight Lines Corp. v. United States, 76 F.Supp. 526 (D.N.J.1948); St. Louis-San Francisco Railway Company v. United States, 207 F.Supp. 293 (E.D.Mo.1962).

On this phase of the case, the record discloses that on the critical date of August 22, 1957, Saldutti had on file with the Commission 28 contracts with different shippers, but apparently was operating under only 20 of them. As of the date of the hearing before the Examiner on June 7, 1960, Saldutti was operating under 22 contracts. Under its contract carrier permit, Saldutti was authorized to transport some 30-odd different commodity groups. It performed varied transportation and non-transportation services for its customers and operated several different types of equipment[2]. Mr. Chirls, Saldutti's president and chief executive officer, testified that the service rendered by Saldutti could be described as being available to any member of the public having shipments which re-

quire movement within the scope of Saldutti's authority, but subject to its specific charges and conditions.

Saldutti contends that its service to 22 shippers constitutes service for a "limited number of persons" within the meaning of section 203(a) (15) of the Act. It points out that a number of shippers served by it have been customers for periods ranging from 20 to 35 years, and that many of these customers formerly performed, as private carriers, the transportation function now being conducted for them by Saldutti; that it employs no traffic solicitors; that it performs no terminal operations; that its rates differ from shipper to shipper, depending upon the individual needs of each shipper; that it receives no compensation, other than its transportation charges, for some of the special services rendered to its shippers; and that it refuses to negotiate with shippers when it does not believe it could provide service for such shippers beyond those normally available from common carriers. As to its present authority to transport more than 30 different commodity groups, Saldutti argues that since it serves only a few shippers per commodity, that this equates to a "limited number of persons" under the Act. In effect, what Saldutti is saying is that its broad commodity authority should entitle it to a larger number of shippers within the concept of a "limited number".

In further support of its contention that it is operating under continuing contracts for a "limited number of persons", Saldutti cites the case of Armored Motor Service Co., Inc., Conversion Proceeding, 77 M.C.C. 433 (1958). Of the 11 named armored car carriers in that case, 6 served from 35 to 314 shippers, and the others from 7 to 21 shippers. In concluding that such carriers were contract carriers despite the fact that some of them operated under large numbers of contracts, the Commission stressed the unusual and

2. On the critical date of August 22, 1957, Saldutti operated 16 straight trucks, 11 tractors, and 20 semi-trailers. On June 7, 1960, Saldutti was operating 16 straight trucks, 16 tractors, and 26 trailers, consisting of vans, open-tops, platforms, and tanks.

highly specialized service rendered by them and that such service was actually confined to a limited class of customers, and that under the circumstances said carriers could properly be considered as serving a "limited number of persons". In its decision, the Commission was careful to point out that its determination was limited to the particular facts of that case, and that such determination should in no way be considered binding in proceedings where the facts and circumstances differed materially from those in Armored.

The Commission, in the Saldutti proceedings distinguished the Armored case, as follows (at page 5 of its report):

" * * * Although respondent's operations are conducted in a limited area, it serves a variety of shippers, performs varied transportation services, handles a number of dissimilar commodities, and operates several different types of motor vehicles. In the Armored Motor Service case, it was found that respondents provided a highly specialized and unusual service for a limited class of customers, and that respondents properly could be considered as serving a 'limited number of persons' 77 M.C.C. at 439. Upon the facts presented here and in the absence of any special or unusual circumstances such as were found to exist in the Armored Motor Service case, we conclude that respondent, operating as it does under contracts with at least 20 shippers, is not conducting operations 'under continuing contracts with one person or a limited number of persons'."

■ We are satisfied the Commission gave consideration to all relevant factors bearing on the issue of "limited number" and that there is substantial evidence in the record to support the Commission's conclusion that Saldutti does not operate under continuing contracts with a "limited number of persons" within the meaning of section 203(a) (15) of the Act;

that its operations are those of a common carrier; and are otherwise lawful.

■ Since there is substantial evidence to support the Commission's conclusion that Saldutti does not meet the basic criterion of operating under continuing contracts with a "limited number of persons", a consideration of the other criteria laid down in section 203(a) (15) becomes unnecessary. However, the Commission did consider the testimony adduced by Saldutti on these issues and found that there was neither an assignment of motor vehicles nor specialized service within the meaning of section 203(a) (15).* Again, our examination of the record satisfies us that the Commission's conclusion in this regard was supported by substantial evidence.

With respect to the "assignment of motor vehicles for a continuing period of time to the exclusive use of each person served", the record shows that what Saldutti does is to furnish to each of its customers the type of vehicle needed for the particular commodity to be transported. Such equipment is made available as needed. There is no assignment of any specific piece of equipment for the exclusive use of a particular shipper.

■ As to the rendering of "transportation services designed to meet the distinct need of each individual customer", the record discloses that the Commission gave full consideration to the nature of the services performed by Saldutti and concluded they did not fulfill the requirement of "distinct need". The Commission's observation that the services rendered by Saldutti were not such as could be performed only by a contract carrier was not error. If the services relied upon by a contract carrier to show "distinct need" are of a type commonly performed by common carriers of the same or similar commodities, this would tend to indicate that such services do not meet the distinct needs of a shipper. Certainly the case of U. S. A. C. Transport, Inc. v. J-T Transport Co., Inc., reported in I. C. C. v. J-T Transport Co.,

368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), cited by Saldutti, does not preclude the Commission from giving consideration to the nature of the services rendered by a carrier in determining status under section 203(a) (15) of the Act.

Another contention made by Saldutti is that the Commission erred in considering " * * * certain information contained in [its] records, of which [it has] taken official notice * * *". Saldutti claims it is unaware of the material which was considered by the Commission or what bearing it might have on the issues, and contends that a consideration of such records under those circumstances deprives Saldutti of due process. There is no substance to this argument because the Commission report makes clear that the "records" of which the Commission took official notice were those filed by Saldutti itself pursuant to Commission regulations. It is also well established that a regulatory agency has the right to take official notice of reports filed with it by a regulated company. Market Street R. Co. v. Railroad Commission, 324 U.S. 548, 561–562, 65 S.Ct. 770, 89 L.Ed. 1171 (1945); Wisconsin v. Federal Power Commission, 91 U.S. App.D.C. 307, 201 F.2d 183, 186–187 (1952), cert. den. 345 U.S. 934, 73 S.Ct. 795, 97 L.Ed. 1362.

It is also to be noted that there is considerable merit to the Commission's argument that Saldutti's failure to question, in the petition for reconsideration filed with the entire Commission, the conclusion of Division 1 that Saldutti should be converted from a contract to a common carrier, now precludes Saldutti from raising the issue in this Court. See United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); United States v. Capital Transit Co., 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93 (1949); Gateway Transportation Co. v. United States, 173 F.Supp. 822 (W.D.Wis.1959). However, in view of the determination above, we find it unnecessary to decide this point.

It now remains for us to consider the scope of the common carrier certificate intended to be issued to Saldutti in lieu of its contract carrier permit.

Section 212(c) of the Act requires the Commission to issue to a carrier converted from a contract to a common carrier a certificate which shall "authorize the transportation, as a common carrier, of the same commodities between the same points or within the same territory as authorized in the permit."

Under paragraph 1 of its permit, Saldutti was authorized to transport general commodities "received from, or delivered to, port facilities, or places of storage before or after a movement by water, for persons who are commonly known as exporters, importers, brokers or steamship agents".

In connection with the Saldutti conversion, the Examiner recommended, and the Commission approved, a rephrasing of the language of paragraph 1 of the permit, which was intended to make clear that Saldutti, as a common carrier, would be authorized to transport general commodities "having a prior or subsequent movement by water" only. Saldutti contends that its present permit authorizes it to transport general commodities to and from port facilities regardless of whether the goods ever had a water movement, and that the change in language deprives it of the right to transport "the same commodities between the same points" in violation of section 212 (c) of the Act.

This argument calls into play rules of grammatical construction. Saldutti claims that the restriction, "before or after a movement by water" modifies only "places of storage" and not "port facilities"; that if the Commission intended the phrase, "before or after a movement by water", to also modify "port facilities", it would have manifested this intent by inserting a comma after the word "storage". The absence of this comma, says Saldutti, indicates that traffic destined to or originating at port facilities is unrestricted.

Under section 212(c) of the Act, a converted carrier is entitled to receive at the hands of the Commission a certificate that maintains parity with the operating authority contained in its contract carrier permit. The controlling factor is the operating rights authorized by the present permit. The Commission found the restriction "before or after a movement by water" to be clear and unambiguous, and that it applied to "places of storage", as well as to "port facilities", and that, as so interpreted, it insured parity between Saldutti's past and proposed future operations. This interpretation is buttressed by Saldutti's own witness, Mr. Chirls, who, in answer to a question put to him by the Examiner, admitted that all shipments transported by Saldutti had a prior or subsequent movement by water.

■ Saldutti also claims that since the issuance of its permit in 1953, and prior thereto under its "grandfather" grant, it always believed that its authority to serve port facilities included the right to do so regardless of whether a water movement was involved. Saldutti says that during this period it was in frequent communication with the Commission and that never once has this right been challenged. The Commission's failure to correct Saldutti in its mistaken belief regarding the scope of its authority does not estop the Commission from asserting the proper interpretation of the permit in an appropriate proceeding. See Bird Trucking Co. v. United States, 159 F.Supp. 717 (W.D.Wis.1955).

Another argument concerning Saldutti's authority as a common carrier is addressed to paragraph 2 of the certificate.

Under paragraph 2 of its permit, Saldutti had authority to transport, within certain geographical limits, the following commodities:

"Absorbent cotton, acids, acid compounds, asphaltum, cement, chalk, chemicals, chemical compounds, distilled pine products, drugs, enamels, gases, greases, lacquers, lime, metals, minerals, natural and synthetic resins and gums, naval stores, oils, paint, pitch, plaster, soap, solvents, surgical dressings, tallow, tar, varnishes, wax, and whiting, in containers only; leather and rope; and equipment, materials and supplies, used by persons engaged in the manufacture, production, distribution, or sale of the aforesaid commodities; for persons who are engaged in the manufacture, production, distribution, or sale of the aforesaid commodities."

In the proposed common carrier certificate, the same commodities authorized by the permit are repeated in the certificate. The only change made by the Commission was to rephrase the language beginning with the word "equipment" in the permit, to read as follows in the certificate: "equipment, materials and supplies used in the manufacture, production, distribution, or sale of the aforesaid commodities.".

Saldutti objects to this change of language because it still carries over into the certificate a limitation in the permit regarding the persons for whom Saldutti can provide service [3]. It argues that had it originally been a common carrier, it would have been entitled to general commodity authority without such limitation, and that it was entitled to a grant of such authority in the conversion proceeding under section 212(c) of the Act. No cases are cited in support of this last proposition.

■ There is no authority under section 212(c) of the Act to issue a certificate for the transportation of commodities not authorized in the permit of the

---

3. The limitation has to do with the so-called "intended use" test, which in this case restricts the carrier to transporting only such "equipment, materials and supplies [as are] used in the manufacture, production, distribution, or sale of the * * * [specified] commodities."

carrier. Since paragraph 2 of the permit does not authorize Saldutti to transport "general commodities", the Commission would have no right to incorporate such authority, or to otherwise enlarge Saldutti's operations, in the certificate to be issued in the conversion proceeding.

■ However, Saldutti is not left without a remedy on the question of the scope of its common carrier certificate. If, as Saldutti contends, the operations on which its original authority from the Commission was based, would entitle it to "general commodities" authority as a common carrier, the remedy is to petition the Commission to re-open the "grandfather" proceedings. See J. B. Montgomery, Inc., Modification of Permit, 83 M.C.C. 457 (1960).

■ The law is clear that the Commission's interpretation of a carrier's permit or certificate is binding on the courts unless clearly erroneous, arbitrary or capricious. Andrew G. Nelson, Inc., v. United States, 355 U.S. 554, 78 S.Ct. 496, 2 L.Ed.2d 484 (1958); Southwest Freight Lines, Inc., v. Interstate Commerce Commission, 184 F.2d 149 (8 Cir. 1950); United Truck Lines v. Interstate Commerce Commission, 189 F.2d 816 (9 Cir. 1951). We cannot say, on the present record, that the Commission's interpretation of Saldutti's authority under paragraphs 1 and 2 of the permit is clearly erroneous, unreasonable, capricious, or arbitrary.

■ Upon a review of the entire record in this case we are satisfied the order of the Commission must be affirmed. In our opinion said order is supported by substantial evidence and is in accord with applicable law. A court cannot substitute its judgment for that of the Commission, but can only ascertain whether there is warrant in the law and facts for the order under review. Shein v. United States, 102 F.Supp. 320 (D.N.J. 1951) aff'd 343 U.S. 944, 72 S.Ct. 1043, 96 L.Ed. 1349.

An appropriate order may be submitted.