George R. **EDDLEMAN**, Clarence Eddleman, Charlie R. Eddleman and Joe W. Eddleman, doing business as Eddleman Brothers, Plaintiffs,

and

Denver Meat Company (Kovick Meat Company) and Litvak Meat Company, Intervening Plaintiffs,

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants,

and

Consolidated Freightways Corporation of Delaware, Denver-Albuquerque Motor Transport, Inc., Garrett Freightlines, Inc., Red Ball Motor Freight, Inc., Ringsby Truck Lines, Inc. and United-Buckingham Freight Lines, Intervening Defendants.

Civ. A. No. 8195.

United States District Court
D. Colorado.
April 29, 1964.

Barry & Boyle, Denver, Colo., for plaintiff.

John R. Barry, Denver, Colo., for intervening plaintiffs.

Robert F. Kennedy, Atty. Gen. of the United States, Dept. of Justice, Leonard S. Goodman, Arthur J. Cerra, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., and Lawrence M. Henry, U. S. Atty., for the District of Colorado, Denver, Colo., for defendants.

Jones, Meiklejohn, Kilroy, Kehl & Lyons, Edward T. Lyons, Jr., Denver, Colo., for intervening defendants.

Before LEWIS, Circuit Judge, and ARRAJ and DOYLE, District Judges.

DOYLE, District Judge.

The plaintiffs herein, partners doing business as Eddleman Brothers, brought this action seeking to set aside and enjoin the enforcement of orders of the Interstate Commerce Commission, which orders denied their application for authority to operate as a contract carrier by motor vehicle.

The plaintiffs' application, filed March 26, 1962, and amended April 16, 1962, seeks the issuance of a permit to operate in interstate commerce over irregular routes, carrying meat, meat by-products, and articles distributed by packing houses between Denver, Adams, Jefferson, Weld, and Arapahoe counties in Colorado, and points in Texas, Arizona, California, Oregon, Washington, and Utah. On return trips, plaintiffs propose to carry frozen foods. Both the application and the amended application purport to seek contract carrier authority, pursuant to Section 209 of the Interstate Commerce Act (Title 49 U.S.C. § 309). On April 20, 1962, plaintiffs were granted temporary authority pursuant to Section 210a (a) of the Act (Title 49 U.S.C. § 310a (a)) to conduct operations pending determination of their application for permanent authority.

A public hearing on the application was held before an Examiner at Denver, Colorado on July 17, and October 4, 1962. At the first hearing testimony on behalf of the proposed operation was given by Mr. George R. Eddleman, a partner in the plaintiff firm, who testified to the operations of Eddleman Brothers under temporary authority, to the scope of the proposed operations, and to the equipment and shop facilities maintained. From this it appears that the company had been operating seven trailers and five tractors under contracts with Litvak Meat Company of Denver and Denver Meat Company of San Jose, California. The plaintiffs' trailers had been mechanically refrigerated, insulated, and equipped with rails for hanging sides of meat. Facilities for cleaning and maintaining the equipment were located in Denver. Equipment had not been wholly dedicated to the use of particular shippers, inasmuch as the trailers continued to bear the name of Eddleman Brothers rather than the names of the contracting shippers, and contracts for return runs were negotiated by Eddleman Brothers rather than by the outbound contracting shippers. The witness did, however, express a willingness to comply with any requirement to assign equipment which might be imposed by the Commission. On inbound movements, the witness stated that contracts would be entered into with receivers of frozen foods and with shippers of exempt commodities. He estimated that there were twenty-five receivers of frozen foods in the Denver area, and presumably hoped to contract with some or all of these receivers on inbound shipments. There was evidence that plaintiffs may have transported two shipments of frozen foods without having authority to do so.

Mr Eddleman expressed reluctance to limit the application to operations specifically on behalf of Litvak Meat Company and Denver Meat Company, both on the theory that he did not wish to be precluded from transporting shipments if one of these firms changed its name, and on

the theory that he hoped to expand operations to other shippers in the future. However, he again expressed a willingness to abide by any restrictions or limitations placed by the Commission on the operations. He further testified that the partners were the sole owners of the stock of another business, the Eddleman Brothers Corporation, which owned and leased four tractors to a common carrier operating under temporary authority.

Testimony was offered by the plaintiffs' accountant with regard to the financial status of the partnership.

The application was supported by testimony given by representatives of the supporting shippers: Sigman Meat Company, Denver Meat Company, Litvak Meat Company, Mountain Frozen Food Company, Grand Junction Fruit Company, and Brown-Weidman Brokerage Company. Mr. Arthur Sigman, president of Sigman Meat, testified that the plaintiffs' operations under temporary authority had met his company's needs for refrigerated equipment, cleanliness, and promptness in pick-ups. Sigman, located in the Denver area, sells to customers located throughout the western states, but the witness did not testify to any shipping activities which his company arranges itself.

The outbound phase of the plaintiffs' proposed operations was supported by witnesses from the Litvak Meat Company and the Denver Meat Company. Litvak, which operates a packing house in Adams County, Colorado, sells to points along the west coast, including points in Arizona, California, Oregon, Washington, Utah, and Texas. The witness testified that promptness in pickups and speedy delivery were very important to Litvak's operations. His firm requires a transportation service which furnishes twenty-two hour delivery to Phoenix, Arizona, thirty-six hour delivery to the Los Angeles and San Francisco areas, and forty hour delivery to points in Oregon and Washington. An animal is generally in Litvak's plant from one and one-half to two days after it is slaughtered, and the company desires a maximum of four days between slaughter and delivery. The witness further testified that Litvak's limited experience with the services of common carriers has been unsatisfactory, having resulted in delays in delivery, delays in pick-ups, and customer complaints, whereas the services afforded by the plaintiffs under their temporary authority had been generally satisfactory. The witness based his confidence in the plaintiffs' services on the fact that deliveries have usually been made either on schedule or ahead of schedule, and that plaintiffs' employees are cognizant of the perishable nature of the products being transported and the importance of punctuality. While Litvak had recently begun to use the railroads' trailer-on-flatcar services and had found them satisfactory, its witness testified that it preferred the plaintiffs' services and would enter into a contract with the plaintiffs if the application were granted.

The witness for the Denver Meat Company of San Jose, California, testified that that company wholesales meat to customers within a seventy-five mile radius of San Jose. The company purchases approximately ninety-five per cent. of its meat from packers in the areas of Denver and Greeley, Colorado, requiring six to ten truckloads each week moving to San Jose, California. Denver Meat Company desires service which affords thirty-six to thirty-eight hour delivery from point of origin with deliveries being made as close as possible to four o'clock A.M. Its employees begin work at that early-morning hour, cut the meat, and begin loading its trucks at six o'clock A.M. for delivery to customers, including a chain store which requires deliveries before noon. The witness testified to several grievances resulting from his company's experiences with the services of common carriers. Although not all of the common carriers serving the necessary destination points have been used by Denver Meat, those which have been used have frequently made late deliveries resulting in customer complaints and cancellation of orders. The company was

said to be similarly impressed by the plaintiffs' services and willing to enter into a new contract with the plaintiffs if the application were granted.

Testimony in support of the inbound phase of the plaintiffs' proposed operations was given by representatives of the Brown-Weidman Brokerage Company and by Grand Junction Fruit Company and its affiliate, Mountain Frozen Food Company, all of Denver, Colorado. These companies, which are distributors and brokers of frozen foods, ship their products from points in California, Arizona, Washington, and Oregon. At times, the suppliers in those states arrange the transportation, and at other times the brokers make the arrangements for the shipments to Denver. The general arrangement would be for the plaintiffs to have first opportunity to transport a shipment if a truck were available at the right time, although other carriers would be used as well. Brown-Weidman did not appear willing to enter into a contract with the plaintiffs, but Grand Junction Fruit Company and Mountain Frozen Food Company were definitely willing to enter into such a contract.

At the second hearing, October 4, 1962, which was presided over by a different Examiner, the plaintiffs' application was opposed by the following carriers, all of which are motor vehicle or railroad common carriers:

Watkins Motor Lines, Inc.; Willis Shaw Frozen Express, Inc.; Curtis, Inc.; Goldstein Transportation and Storage, Inc.; G & H Truck Line, Inc.; Nebraska, Illinois, Colorado Express, Inc.; Pacific Intermountain Express Company; United-Buckingham Freight Lines; Red Ball Motor Freight, Inc.; Denver-Albuquerque Motor Transport, Inc.; Ringsby Truck Lines, Inc.; Santa Fe Trail Transportation Company; Atchison, Topeka and Santa Fe Railway Company; Chicago, Milwaukee, St. Paul and Pacific Railroad Company; Chicago, Rock Island and Pacific Railroad Company; Denver and Rio Grande Western Railroad Company; Great Northern Railway Company; Missouri-Kansas-Texas Railroad Company; Missouri Pacific Railroad Company; Northern Pacific Railway Company; St. Louis-San Francisco Railway Company; St. Louis Southwestern Railway Company; Southern Pacific Company; Texas and Pacific Railway Company; Union Pacific Railroad Company; Western Pacific Railroad Company; Consolidated Freightways Corporation of Delaware, and Garrett Freightlines, Inc.

There appears to be no question but that these protesting carriers, individually or collectively, serve either directly or through interchange, all of the destination points specified in plaintiffs' application. Many meet the supporting shippers' transit time requirements. It further appears that at least two of these protestants, Consolidated and Ringsby, submitted testimony that they could effect a four o'clock A.M. delivery at the Denver Meat Company plant in San Jose if they were given adequate advance notice. Ringsby, which affords an intransit time of approximately thirty-six hours to San Francisco, appeared able to make a four o'clock A.M. delivery if the truck left Denver by four o'clock P. M. Those protestants who presented testimony at the hearing, Consolidated, Ringsby, Curtis, Watkins, Garrett, Santa Fe Trail, and Denver-Albuquerque, all possessed the necessary refrigerated equipment, as did Red Ball, United-Buckingham, and P. I. E., whose evidence was received by stipulation of the parties.

In addition, the witness for Ringsby presented testimony to the effect that the grants of temporary authority to five other competing carriers of refrigerated items had resulted in a loss to Ringsby, and that it needed all of the perishable freight it could acquire in order to keep its less-than-truckload service in operation.

The Examiner recommended the denial of the application in its entirety, and his report and recommended order were served March 28, 1963. After consideration of the exceptions filed by plaintiffs

and the joint replies filed by those carriers who are intervening defendants herein, the Examiner's report and recommendation were affirmed and adopted by the Commission, Division 1, in its Decision and Order of August 15, 1963. (Reported at 94 M.C.C. 81) It was therein concluded that, in view of the evident reluctance on the part of the plaintiffs to limit their proposed services to the named supporting shippers, and of the evidence that the proposed services are not unique but are performed by other motor carriers, plaintiffs' application was in substance, although not in form, an application for common carrier authority. The application was, then, treated as an application for common carrier authority rather than as an application for contract carrier authority. It was further concluded that the applicant established neither that there was a public need for the proposed service nor that the existing carriers' services would be inadequate to handle the supporting shippers' traffic. Plaintiffs' temporary authority was ordered cancelled on August 23, 1963.

On September 13, 1963, the Court issued a temporary restraining order enjoining the Commission from cancelling the temporary authority previously granted to plaintiffs in No. MC–124363 Sub 1 TA. Subsequently, on October 7, 1963, hearing was had before this three-judge Court on plaintiffs' motion for an order restraining and suspending the operation of the Commission's Orders of March 28, August 15, and August 23, 1963, in Docket No. MC–124363 pending final determination of the instant action. An Order granting a preliminary injunction was issued on October 28, 1963.

The instant action is brought pursuant to Title 28 U.S.C. § 1336, which empowers the United States District Courts with jurisdiction to "enforce, enjoin, set aside, annul or suspend," an order of the Interstate Commerce Commission. A three-judge District Court was convened to hear the case pursuant to Title 28 U.S.C. § 2325.

The issue before us is whether the Commission's treatment of the plaintiffs' application as an application for common carrier authority was justified by the facts presented or by the law.

### I.

The Commission and the intervening defendants argue that it was the initial duty of the plaintiffs to show that their proposed operation would bring them within the definition of "contract carriers" as provided in § 203(a) (15) of the Interstate Commerce Act (49 U.S. C. § 303(a) (15)) which provides:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation [other than a person referred to as a 'common carrier'] under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer." [1]

1. An excellent discussion of the legislative history of this section may be found in P. Saldutti & Son v. United States (D. N.J.1962), 210 F.Supp. 307, wherein the Court noted that the intent of the amended Act was to " * * * preserve the basic distinctions between common and contract carriers and to overcome the effect of the decision in United States v. Contract Steel Carriers, Inc., 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482 (1956)." In the Contract Steel Carriers case the

Supreme Court held that the Commission had no power to prevent active solicitation of business by a contract carrier so long as the business solicited was within the bounds of the carrier's license. The amendment of § 203(a) (15) in 1957 established three criteria for determining whether a carrier's operations are those of a contract carrier; as explained in Saldutti:

" * * * The basic test is transportation 'under continuing contracts with one

In support of their position, the defendants rely upon the statement of the Supreme Court in I. C. C. v. J-T Transport Co. (1961), 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147, that in consideration of an application for a contract carrier permit,

> "The proper procedure * * * is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants."
> [368 U.S. at p. 90, 82 S.Ct. at p. 210, 7 L.Ed.2d 147]

It is argued that since the Commission concluded that the proposed service was not one designed to meet the "distinct needs" of the supporting shippers, the plaintiffs were stopped at the threshold of their case: they did not make an adequate showing that they were proposing a contract carrier operation.

If the Commission had properly concluded that the plaintiffs' evidence did not establish that the proposed service would meet distinct needs of the supporting shippers, the proper procedure would have been for the commission to deny the plaintiffs' application for a contract carrier permit. But it appears that what was actually denied was the issuance of a certificate of public convenience and necessity, which is, so to speak, a permit to operate as a *common* carrier.[2] This unusual procedure has resulted in the denial of a full and fair hearing on the merits of the application, required by § 205 of the Act. Cf. Lang Transportation Corp. v. United States (S.D.Calif., 1948) 75 F.Supp. 915. Both the application filed by the plaintiffs and the amended application requested the issuance of a permit to operate as a contract carrier. Plaintiffs could reasonably expect that

person or a limited number of persons'. All contract carriers must conform to this test. The remaining criteria, 'for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served,' and 'for the furnishing of transportation services designed to meet the distinct need of each individual customer,' are stated in the disjunctive and compliance with either, coupled with compliance with the basic test will be sufficient to bring a carrier within the statutory definition of a contract carrier." [210 F.Supp. at 310, 311.]

2. Although it is not specifically a denial of a certificate of public convenience and necessity, the Decision and Order of the Commission concludes:

> "The examiner finds [and the Commission affirms] that the proposed operation is that of a common carrier by motor vehicle; that the applicants have failed to establish that the present or future public convenience and necessity require the proposed operation; and that the application should be denied." [94 M.C.C. at p. 95]

The interpretation placed upon this wording by counsel for the Commission during argument before this Court was that the plaintiffs have never been denied authority to operate as a *contract* carrier.

Were we to construe the Commission's action to be a denial of authority to operate as a contract carrier, we would necessarily reverse the action for failure to apply the standards required for such a determination by § 209(b) of the Act. Cf. I. C. C. v. J-T Transport Co. supra. As was the case in J-T, the Commission has here found that the applicant established neither that there was a public need for the proposed service nor that the existing carriers' service would be inadequate to handle the supporting shippers' traffic. The Supreme Court held that these considerations are inappropriate to a contract carrier application.

> "* * * [A]s we read the Act, as amended in 1957, the standard is not whether existing services are 'reasonably adequate.' It is whether a shipper has a 'distinct need' for a different or a more select or a more specialized service. The protesting carriers must show they can fill that 'distinct need,' not that they can provide a 'reasonably adequate service.'"
> [368 U.S. 90, 91, 82 S.Ct. 204, 210, 7 L.Ed.2d 147.]

the Commission would require them to present evidence to establish the propriety of this step—evidence relevant to the standards set forth in § 209(b) of the Act. [49 U.S.C. § 309(b)]. As now amended, that section provides five standards:

"* * * In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in [this Act], the Commission shall consider [1] the number of shippers to be served by the applicant, [2] the nature of the service proposed, [3] the effect which granting the permit would have upon the services of the protesting carriers and [4] the effect which denying the permit would have upon the applicant and/or its shipper and [5] the changing character of that shipper's requirements." [Bracketed numbers added by the Supreme Court in the J-T case, 368 U.S. 106, 82 S.Ct. 204, 209, 7 L.Ed.2d 147]

The evidence which plaintiffs presented may not have fulfilled these standards. This issue is not now before us. It was, however, designed to establish the propriety of the grant of a *contract* carrier permit. The evidence which is relevant to contract carrier standards is often different in type and degree from evidence which is relevant to common carrier standards set forth in § 207(a) of the act. [49 U.S.C. § 307(a)] Colorado-Arizona-California Express v. United States (D.Colo.1963), 224 F.Supp. 894; Robbins v. United States (E.D.Pa.1962), 204 F.Supp. 78. This purported preference for substance rather than form does not commend itself when, in an administrative proceeding such as that at bar, an individual is effectively denied the opportunity to know the standards by which he is to be judged. Cf. I. C. C. v. Arpel, Inc., (S.D.Fla., 1962) 211 F.Supp. 370, § 7 Administrative Procedure Act, [5 U.S.C. § 1006]. Furthermore, the plaintiffs could not reasonably be required to present evidence of a *public need* for the proposed services since such evidence was irrelevant to the issues which were placed before the Commission by the plaintiffs' application.

As was clearly, and concisely stated by Mr. Justice Brandeis in the New England Divisions case, Akron, C. & Y. Ry. Co. v. United States (1923), 261 U.S. 184, 200, 43 S.Ct. 270, 277, 67 L.Ed. 605:

"A full hearing is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice, and law, *of the step asked to be taken.*" [Emphasis supplied.] See also Consolidated Freightways v. U. S., (E.D.Wash., 1949), 83 F.Supp. 811, 814.

The failure of the Commission to afford plaintiffs a full and fair hearing on the "step asked to be taken" must here be regarded as clear error.

## II.

The defendants urge us to uphold the order on other grounds which we need not consider here in detail. Among other arguments, it is urged that the plaintiffs do not come within the "basic test" of contract carrier operation, viz., the requirement that the proposed operation be confined to continuing contracts with one person or a limited number of persons. P. Saldutti case, supra. In response to a question put to him by the Examiner, one of the plaintiffs, Mr. George Eddleman, replied that he hoped to expand his operations "later on." This statement and other similar statements made by Mr. Eddleman lead the defendants to argue that the plaintiffs sought to conduct their operations under contracts with more than a limited number of shippers. The Commission's conclusion was that:

"While applicants indicated a willingness to accept a limitation restricting the proposed service to that on behalf of named shippers supporting the application if such a restriction is imposed by the Commission,

it is manifest that they would so limit their proposal only for the purpose of becoming eligible to receive a permit as a contract carrier." [94 M.C.C. at p. 93.]

Assuming this conclusion to be correct, we do not believe that such a natural reaction should be considered fatal to the applicants. The Commission is empowered by § 209(b) to impose such terms or limitations "as may be necessary to assure that the business is that of a contract carrier." The Commission may regulate the number of shippers with whom a contract carrier contracts, and also has the power under § 212(c) to re-examine each outstanding permit. Cf. Tar Asphalt Trucking Co. v. United States (D.N.J., 1962), 208 F.Supp. 611. The Commission did not make any finding that the plaintiffs were *unwilling* to perform the service of a contract carrier or to conform to the provisions of the law and the requirements, rules and regulations of the Commission. Cf. § 209 (b).

### III.

We must, however, in the interest of the most expeditious handling of the instant matter, consider one further issue which is presented: whether the Commission applied the appropriate standards to its determination that the proposed operations would not meet the distinct needs of the supporting shippers.

A perusal of the Commission's conclusions reveals that the Report does not recognize the distinction between the two questions: [1] whether the supporting shippers presented evidence that they have a distinct need, and [2] whether the operation proposed by the applicants is designed to meet those distinct needs. This distinction is crucial in the light of the philosophy expressed in the J-T case, supra, that "[u]nder the statute [applicable to contract carriage] a shipper is entitled to have his distinct needs met." 368 U.S. at p. 92, 82 S.Ct. at p. 211, 7 L.Ed.2d 147.

The Commission's conclusion was that:

"As seen, applicants do not intend to assign motor vehicles for a con-tinuing period of time to the service of any of the supporting shippers. The commodities involved are regularly transported by common carriers of general and special commodities operating mechanically refrigerated trailers equipped with meat rails. All of the motor protestant common carriers provide this type of service, and the supporting shippers expressed a need for expeditious transportation of the considered commodities. The supporting packers in addition want a 4 a. m. delivery at San Jose, but they have not attempted to obtain this service from some of the protestants. The evidence indicates that such carriers, if given adequate notice to enable them to schedule departures sufficiently in advance, can meet shippers' requirements in these respects as well, or nearly so, as applicants. There is nothing unique or specialized about the service which the supporting shippers require which distinguishes it from that usually afforded by motor common carriers. The proposed service, therefore, is not one designed to meet the distinct need of each of the supporting shippers * * *." [94 M.C.C. at 92, 93]

The Commission did not specifically find that the supporting shippers had not shown a distinct need, but instead concluded that the supporting shippers had not shown that the service of existing carriers was inadequate. This conclusion is not determinative. I.C.C. v. J-T Transport Co., supra, 368 U.S. at p. 88, 82 S.Ct. 204, 7 L.Ed.2d 147. That case made it clear that in determining whether issuance of a contract carrier permit will be consistent with the national transportation policy the Commission must consider the criteria set out in § 209(b) of the Act and must do so without manifesting special solicitude for any one of the five criteria in preference to the others. Or, as we held in Atchison, T. & S. F. R. R. v. United States, (D. Colo., 1964), 225 F.Supp. 584, [in connec-

tion with § 15(6) of the Act], "[I]t is by no means true that the Commission may seize upon one factor and ignore the rest." Cf. F. P. C. v. Transcontinental Gas Pipe Line Co., (1960), 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377.

■ In J-T as here, the particular criterion favored was "that criterion which directs attention to the situation of protesting carriers, at the expense of that which directs attention to the situation of supporting shippers." 368 U.S. at p. 89, 82 S.Ct. at p. 209, 7 L.Ed.2d 147. The J-T rule means, among other things, that the burden of proving that the existing services are inadequate is not to be placed upon the applicant. 368 U.S. at p. 90, 82 S.Ct. at p. 210, 7 L.Ed.2d 147. It means that proceedings involving contract authority are different from cases involving applications for certification of common carrier authority under § 207(a) of the Act, wherein a showing of convenience to the supporting shipper falls short of requiring the issuance of a certificate of convenience and necessity, cf. Colorado-Arizona-California Express v. United States, supra; Curtis, Inc. v. United States, D.C., 225 F.Supp. 894. Such a consideration would appear at least to be proper in a determination of an application for contract carrier authority. We do not, of course, say that convenience is a controlling factor; only that it is, when placed in issue by the evidence adduced at the hearing, a factor to be weighed by the Commission as an element of the fourth criterion set out in § 209(b): "the effect which denying the permit would have upon the applicant and/or its shipper."

■ Similarly, a finding that the protesting carriers, "*if given adequate notice to enable them to schedule departures sufficiently in advance*, can meet shippers' requirements * * * as well, or nearly so, as applicants," is not sufficiently supported unless it is clear that the Commission directed its attention to whether, if put in issue by the evidence, notice given adequately in advance to meet the needs of the existing carriers is also adequately short notice to meet the needs of the supporting shippers.

■ The above are considerations which the Commission must take into account in determining whether the supporting shippers have established that they have a distinct need. The fact that the services requested by the supporting shippers are "of a type commonly performed by common carriers of the same or similar commodities * * * would tend to indicate that such services do not *meet* the distinct needs of [the] shipper[s]." P. Saldutti case, supra, 210 F. Supp. at 312. However, this tendency cannot be controlling, for "many contract carriers would be driven out of business because they could not meet the test of performing a service 'not provided by common carriers.'" J-T case, 368 U.S. at p. 86, 82 S.Ct. at p. 208, 7 L.Ed.2d 147.

■ We are not unmindful of the Commission's wide range of discretion, nor of the latitude extended to it to apply its administrative expertise. We must, however, uphold the Commission's orders upon the basis of the reasons given by the Commission. Security and Exchange Commission v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995; Atchison, T. & S. F. R. R. v. United States, supra. Being unable to do so here, we must remand the cause to the Commission.[3] It is, therefore,

ORDERED that the Commission's Orders of August 15, 1963, and August 23, 1963, are hereby set aside and the cause is remanded to the Commission for further proceedings consistent with the views expressed herein.

---

3. Plaintiffs have prayed for an order enjoining the enforcement of three of the Commission's Orders, among them, "the Commission's Order of March 28, 1963."

This Order was merely the recommended report and order of the Examiner, having no finality, and as such the request for such an order is dismissed.