**MIDWEST TRUCK LINES, LTD., a Canadian Company, Plaintiff,**

v.

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Defendants.**

**Civ. A. No. 1013–66.**

United States District Court
District of Columbia.

April 28, 1967.

William S. Rosen, Saint Paul, Minn., for plaintiff.

Robert W. Ginnane, General Counsel, Fritz R. Kahn, Associate General Coun-

sel, and Jerome Nelson, Washington, D. C., for Interstate Commerce Commission.

Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger, and David G. Bress, U. S. Atty., for the United States.

Before BURGER and TAMM, Circuit Judges, and MATTHEWS, District Judge.

MATTHEWS, District Judge.

The plaintiff herein, Midwest Truck Lines, Ltd., seeks to set aside an order of the Interstate Commerce Commission denying the contract carrier authority applied for by plaintiff, and to have the Commission directed to issue to plaintiff the permit sought in its application. This three-judge court was convened pursuant to 28 U.S.C. §§ 2284, 2321–2325.

On May 11, 1963, plaintiff made an application to the Interstate Commerce Commission pursuant to Section 209(b) of the Interstate Commerce Act [1] for a permit to operate as a contract carrier by motor vehicle over irregular routes. As a Canadian trucking corporation, plaintiff for over 25 years has transported fish from Canada to various midwestern cities in the United States, and in its mentioned application seeks to operate as a contract carrier for Motor Coach Industries, Inc., a manufacturer of buses with a plant located at Pembina, North Dakota, near the Canadian border. In such capacity plaintiff proposes to use its trucks on their return trips to Canada to pick up parts usable in the manufacture and assembly of buses from various suppliers of said manufacturer at 15 points [2] in the midwest, and to haul these parts to the manufacturer's plant at Pembina, North Dakota.

As ground for the relief sought here plaintiff asserts that the evidence supports its application and meets all criteria which the Commission was called upon to consider, and that the denial of its application was contrary to the evidence and the applicable law, and was arbitrary and capricious, and not consistent with the public interest and the national transportation policy.

An Examiner for the Commission held a hearing on plaintiff's application at Chicago, Illinois, on October 21, 1963, the application being opposed by six protestants.[3] The Examiner recommended that the application be denied. On October 11, 1965, Division One of the Interstate Commerce Commission issued its report and order denying the application, one Commissioner dissenting. 99 M.C.C. 697. Thereafter, on November 8, 1965, plaintiff filed a petition seeking a finding of "general transportation importance" which would serve to put the case before the entire Commission. The petition was denied November 19, 1965. This action followed on April 19, 1966. The protestants have not sought to intervene herein.

There is no material dispute as to the facts. The Commission, with one exception,[4] adopted the Examiner's statement of facts as its own. As background for the present controversy, the facts will be related.

The Pembina manufacturer, Motor Coach Industries, Inc., herein called Motor Coach, is a Delaware Corporation and a wholly-owned subsidiary of the Greyhound Corporation of Chicago, Illinois, which also has a Canadian subsidiary corporation known as the Greyhound Lines of Canada, Ltd., which, in turn, has a wholly-owned subsidiary known as Motor Coach Industries, Ltd., of Winnipeg, Canada. The latter-named company has a plant at Winnipeg for the manufacture

1. 49 U.S.C. § 309(b).

2. These points are: Detroit, Wyandotte, Flint and Grand Rapids, Michigan; Dayton, Mansfield, Cleveland, Toledo and Newark, Ohio; New Castle, Pennsylvania; Elkhart, Lafayette, Noblesville and Anderson, Indiana; and Racine, Wisconsin.

3. Norwalk Truck Lines, Inc., Central Wisconsin Motor Transport Co., Gateway Transportation Co., Glendenning Motorways, Inc., Hart Motor Express, Inc., and United-Buckingham Freight Lines.

4. The exception is "insofar as it suggests that Hart [a protestant] is authorized to serve Pembina." 99 M.C.C. 697 at 698.

of complete buses, which mainly are sold within Canada, but the demand has become greater than its production capacity. To meet demands outside of Canada, Motor Coach was created and a new plant was constructed at Pembina, North Dakota, but the "bus shells" will continue to be manufactured at the Winnipeg plant and then moved by private carriage to the Pembina plant for assembly as completed buses for sale in the American market. The buses manufactured by Motor Coach at Pembina are offered for sale to any bus-operating company that wishes to buy them. Other reasons for the construction of the plant at Pembina were to provide for the shortest possible haul of bus shells from the Winnipeg plant to the Pembina plant, and to reduce the travel distance for the managerial staff between Winnipeg and Pembina.

Completed in May 1963, the plant at Pembina has modern shop facilities and is fully conveyorized. It is designed to produce one bus each working day, or five buses per work week of five days. The total area of the plant is 25,920 square feet. The assembly and test lines take up 85 per cent of the area space, and the remaining 15 per cent is used for storage, rest rooms, heating plant, etc. The plant was arranged with the preconceived plan (1) that its many suppliers at their respective plants would utilize their own storage space to keep the supplies ordered for the Pembina plant until such time as they are needed in Pembina, and (2) that thereby Motor Coach would be able to reduce its initial and continued capital investments in both the use of storage space and the maintenance of large inventories, and thereby ultimately reduce completed-bus costs.

At the hearing before the Examiner, Motor Coach asserted (and it is without dispute in the evidence) that its factory is designed on a continuous flow principle whereby materials coming from suppliers must move in a constant stream through general storage, preassembly, testing and final assembly; that at any one time the Pembina plant's own storage area can accommodate only enough major components for five buses; that Motor Coach purchases supplies in large quantities from suppliers who keep them in their own storage facilities available for transportation in small lots to the Pembina plant as they are required; that to achieve full production, and to keep its assembly line moving, Motor Coach requires delivery of supplies no later than four days from the time of pickup at the initial origin point; that absent such delivery, costly delays in the assembly process will result; and that the transportation of parts from the plants of suppliers to the plant at Pembina is an integral and vital part of Motor Coach's total operation.

Each bus manufactured by Motor Coach has many optional facilities. Each purchaser may select various options offered by Motor Coach through its literature. As orders come in from bus operators, Motor Coach will require different items of optional equipment, and the delivery of such optional equipment must be closely tied with its production line. Its requirement for these various types of optional equipment varies from week to week and month to month.

When the hearing took place before the Examiner in October 1963, the Pembina plant was new and was going through a so-called "shakedown" process, that is, a preliminary period of training new employees and generally working out problems existent in any new operation. Motor Coach desired to ascertain whether existing common carrier service would be sufficient to satisfy its needs, and during a five-month trial period from May to October 1963 used such service. The existing common carriers were unable to provide the four-day service to Pembina which Motor Coach requires to produce its planned one bus a day and to prevent a shutdown of its assembly line. The common carriers, according to the Examiner, "from the time of picking up shipments have taken from 5 to 13, or more, days for delivery at Pembina."

During the twelve-month period prior to October 1963, plaintiff had at least one

truck available for every day of the year at Chicago, Detroit, Cleveland, Toledo, Akron or Columbus. The method of operation proposed by plaintiff if its application is granted is as follows: Plaintiff will devote at least nine tractor-trailer units, each consisting of a two-man sleeper-cab tractor and a van trailer, to Motor Coach's exclusive use for transportation from the origin points involved in plaintiff's application to Pembina, North Dakota. Plaintiff will advise Motor Coach of the time of departure of each unit from Winnipeg. Upon the arrival of a unit at its destination in the United States the driver will receive instructions from Motor Coach for the return movement of the unit. Plaintiff will provide multiple pickup service at various points involved in its application designed on a reasonable routing basis. Plaintiff will devote its northbound transportation exclusively to meeting the rigid delivery requirements of Motor Coach, and will co-ordinate the movement of its equipment with Motor Coach's production schedule. The plaintiff will assure Motor Coach of delivery within four days from the time of pickup at the initial origin point, and will enter into a continuing contract with Motor Coach for this purpose. The plaintiff employs 22 drivers and has a spare list of 6 drivers.

## THE STATUTES INVOLVED

■ In a proceeding for contract carrier authority, the applicant must first establish that it meets the statutory definition of a "contract carrier by motor vehicle" contained in Section 203(a) (15) of the Interstate Commerce Act.[5] Under such definition a contract carrier by motor vehicle is one who engages in transportation "under continuing contracts with one person or a limited number of persons" either (a) by assigning vehicles for a continuing period of time to the exclusive use of each person served or (b) by furnishing transportation services designed to meet the distinct need of each individual customer.

■ Meeting this definition, the contract carrier is to be issued the permit for its proposed operation if pursuant to Section 209(b) of the Act[6] it appears

---

5. 49 U.S.C. § 303(a) (15). This section reads as follows:

The term "contract carrier by motor vehicle" means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer.

6. 49 U.S.C. § 309(b). This section reads in pertinent part:

Applications for such permits shall be made to the Commission in writing, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the Commission may, by regulations, require. Subject to section 310 of this title, a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the applications or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this chapter and the lawful requirements, rules, and regulations of the Commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in this Act; otherwise such application shall be denied. In determining whether issuance of a permit will be consistent with the public interest and the national transporation policy declared in this Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect

that such operation is consistent with the public interest and the national transportation policy.[7] In making such determination, the Commission must consider five criteria. They are: (1) the number of shippers to be served by the applicant, (2) the nature of the service proposed, (3) the effect which granting the permit would have on the protesting carriers, (4) the effect which denying the permit would have upon the applicant/or its shipper, and (5) the changing character of that shipper's requirements. 49 U.S.C. § 309(b).

## THE COMMISSION'S DECISION

In denying the plaintiff's application, the Commission, Division 1, found that plaintiff had failed to establish that its proposed operation would be consistent with the public interest and the national transportation policy.

In issue here are certain portions of the Commission's decision. For convenience, some of these portions are quoted elsewhere herein, the remainder being as follows:

> We do not believe that the supporting shipper-consignee's limited storage space at Pembina and its requirement that its assembly parts be delivered in accordance with a predetermined schedule constitute, in the circumstances shown here, a distinct need which applicant's proposed service could be said to be designed to meet. Neverthe-

less, applicant proposes, instead, to furnish such service only to Motor Coach Industries, Inc., through the assignment to the exclusive use of such shipper-consignee of those of its vehicles not being used in exempt transportation. There is some question whether the practical aspects of applicant's proposal are repugnant to an assignment of equipment as defined in section 203 (a) (15) of the act. Various questions relative to the assignment of equipment presently are under consideration in No. MC–125230, DeVon Owens Contract Carrier Application, and, in view of our ultimate conclusions herein, it will be sufficient to assume, without deciding, that applicant's proposal does not abridge the concept of assignment of vehicles. We note that applicant has not been prejudiced by the examiner's conclusion to the contrary, inasmuch as he found the proposed operation to be contract carriage and considered the merits of the proposal in the context of its consistency with the public interest and the national transportation policy.

In determining whether the issuance of a permit to applicant will be consistent with the public interest and the national transportation policy, we must weigh the proposal in the light of section 209(b) of the act which requires consideration of the number of shippers to be served by the applicant, the

---

which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements.

7. Congress in 1940 described the national transportation policy:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of rea-

sonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899.

nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect that denying the permit would have upon the applicant and/or its shipper, and the changing character of that shipper's requirements.

As noted, only one shipper-consignee will be served, but applicant has not shown that such person has a distinct need for a type of service not ordinarily offered by common carriers. The service proposed, apart from the assignment-of-vehicles characteristic and the incidental fact that multiple pickups would be attempted by applicant in order to achieve an economically feasible load factor, does not differ substantially from that offered by common carriers generally and by protestants herein. Although it is true that in most cases protestants must join their operations in a two-line haul in order to serve the supporting shipper-consignee at Pembina, such service need not be less expeditious than the proposed single-line operation, because the latter would be subject to significant delays in making several stops at the widely scattered origin points sought. We agree with the examiner that it is unrealistic to compute anticipated transit time on the basis of applicant's arriving at each origin during loading hours in view of the long distances between most of the origins. 99 M.C.C. 697 at 702, 703.

## PLAINTIFF'S CLAIM THAT STATUTORY STANDARDS WERE NOT PROPERLY EMPLOYED

The threshold test as to any proposed contract carrier operation is whether it meets the contract carrier definition in 203(a) (15). Plaintiff asserts that the Commission did not make this test in conformity with 203(a) (15). In this regard, some background is necessary.

A contract carrier by motor vehicle is defined in 203(a) (15) as one who engages in transportation under continuing contracts with one person or a limited number of persons *either*—

(a) for the furnishing of transportation services through the assignment of motor vehicles * * * to the exclusive use of each person served *or*

(b) for the furnishing of transportation services designed to meet the distinct need of each individual customer. (Emphasis supplied.)

Under "the alternate part of the statutory definition, whether applicant will furnish transportation services" designed to meet the distinct need of its supporting shipper, the Examiner concluded that a "sufficient amount of applicant's equipment would be on call and available * * * for shipper-consignee's alleged distinct need, and thereby applicant's proposed service is contrived and assigned for that purpose." On the other hand, the Commission assumed, and it is here conceded, that the applicant satisfies the contract carrier definition in 203(a) (15) relative to transportation services through the assignment of vehicles.

■■ The applicant maintains, correctly we think, that under 203(a) (15) it is required to satisfy only *one* definition of a contract carrier, not both definitions. The applicant further maintains that as it satisfied the definition relative to assignment of vehicles it was error for the Commission (1) to impose upon plaintiff the requirement of satisfying also the other alternative in 203(a) (15) regarding distinct need, (2) to place upon plaintiff the burden of proof in respect thereof, and (3) to make an adverse finding of no distinct need under such alternative definition. We agree.[8]

8. In its discussion of 203(a) (15), the Commission stated:

We do not believe that the supporting shipper-consignee's limited storage space at Pembina and its requirement

that its assembly parts be delivered in accordance with a predetermined schedule constitute, in the circumstances shown here, a *distinct need* which applicant's proposed service could be said

As was said in William P. Bursch Extension-Lumber, 91 M.C.C. 953, at 955 (1963):

> The second requirement of the definition is framed in the alternative. Thus even if the proposed operation satisfies no distinct need of the supporting shipper, the assignment of vehicles to the shipper's exclusive use is sufficient to satisfy the definition and to require that the application be evaluated in accordance with the criteria set forth in the section 209(b) of the act.

We cite here a pertinent observation of the late Mr. Justice Frankfurter as to 203(a) (15):

> It should be noted that a contract carrier may so qualify under that section either by meeting the distinct need of a particular customer or by meeting very ordinary needs through the assignment of vehicles to the shipper's exclusive use. *If the latter qualification were controlling in a given case, the consideration of "distinct need" would be irrelevant.* (Emphasis supplied.) Dissenting opinion, I. C. C. v. J–T Transport Co., 368 U.S. 81, at page 121, 182 S.Ct. 204, at page 230, 7 L.Ed.2d 147 (1961).

■ This is not to say, however, that an applicant may rest his case once he has fulfilled the assignment of vehicles definition under 203(a) (15). After qualification under either alternative, issuance of the permit must be justified under the five criteria of 209(b). The term "distinct need" is not mentioned in such criteria. The Commission must determine whether the proposed service is consistent with the public interest and the national transportation policy, and, in so doing, must evaluate the criteria in 209 (b), including "the nature of the service proposed". Naturally, that involves the question of need for the proposed service. I. C. C. v. J–T Transport Co., 368 U.S. 81 at 88, 82 S.Ct. at 209.[9]

Further, the plaintiff claims that the Commission confused the relationship between the "distinct need" definition of contract carriage in 203(a) (15) and the five criteria of 209(b).

■ It seems manifest from the quoted language that the Commission's unnecessary conclusion of no distinct need under the contract carriage definition in 203(a) (15) was carried forward to its 209(b) evaluation as that conclusion was adopted as the primary reason for a negative finding under 209(b). We do not believe that the term "distinct need" in 203(a) (15) is the same as the criteria set forth in 209(b), or that "distinct need" in 203(a) (15) may properly be used interchangeably with the determination to be made under 209(b) pursuant to the prescribed criteria. Meat Packers Express, Inc. v. United States, 244 F.Supp. 642 (U.S.D.C.Neb.1965). We conclude that the unnecessary no distinct need finding under 203(a) (15) may well have provided a prejudicial coloration by the Commission of the Section 209(b) criteria.

We now turn to the five criteria or factors, and their evaluation by the Commission.

### THE FIRST FACTOR

■ The "number of shippers to be served by the applicant" is the first fac-

---

to be designed to meet. (Emphasis supplied.) 99 M.C.C. 697 at 702.
A little later, in discussing 209(a) criteria, the Commission concluded:

> As noted, only one shipper-consignee will be served, but *applicant has not shown* that such a person has a *distinct need* for a type of service not ordinarily offered by common carriers. (Emphasis supplied.) 99 M.C.C. 697 at 703.

**9.** In referring to the five factors in § 209 (b) the Supreme Court said:

> It seems clear from these provisions that the adequacy of existing services is a criterion to be considered by the Commission * * *. Or to put the matter otherwise, *the question of the need of the shipping public* for the proposed service necessarily includes the question whether the extent, nature, character, and suitability of existing, available service makes the proposed service out of line with the requirements of the national tranportation policy. (Emphasis supplied.)

tor the Commission must consider under § 209(b). As to this factor, the Commission found that "only one shipper-consignee will be served" (99 M.C.C. at 703), without indicating the weight or effect of that finding. However, precedent indicates that where, as here, the applicant has one supporting shipper and does not seek any other, it "would be impossible [for the applicant] to make any stronger showing under the test involved." William P. Bursch Extension-Lumber, 91 M.C.C. 953, 957 (1963).

## THE SECOND FACTOR

The second factor the Commission must consider under § 209(b) is "the nature of the service proposed".

As already indicated, the nature of the proposed service is a service assuring Motor Coach of the delivery of supplies at its Pembina plant within four days from the time of pickup at the initial origin point.

Summarizing the needs of Motor Coach, the Examiner said that "based on the plant being in full operation for the manufacture of five completed buses each week of five workdays, they are: Regular weekly pickups of less-truckload shipments from the proposed 15 origins, and the delivery of such shipments at the Pembina plant within four days from the time of pickup at any origin point."

Plaintiff claims that the findings of the Commission fail to disclose whether the Commission held that Motor Coach does not have a distinct need, or that although it does have such a need the applicant's proposed service is not designed to meet it. On the other hand, defendants contend that the Commission made two rulings as to the nature of the proposed service, (1) that though there is only one shipper, it has no distinct need for a type of service not ordinarily offered by common carriers; and (2) that the applicant's service would not differ substantially from that offered by common carriers. The defendants also contend that the Commission's findings necessarily embody "a conclusion that the purported four-day requirement had not been sufficiently proved," and argue as follows:

Granting that the supporting shipper-consignee can store at one time only enough parts for five buses and that the plant will manufacture one bus a day over a five day week, the record fails to show precisely why the manufacturer insisted on four day delivery. Assuming that the plant begins its week with maximum storage parts for five buses, there is no reason apparent on this record why the manufacturer could not, upon completion of each bus, anticipate its needs as much as a full week in advance. Thus if the company makes a bus on Monday, it knows then and there that its storage is depleted to the extent of that one bus. It must then replenish the supply of parts, but will not actually use the replaced materials until the next Monday—a full seven days away.

This argument assumes that delivery of bus components permits their use forthwith on the assembly line. In the nature of things, there must be an unpacking, inspection, testing and moving of parts to the production area before their use on the assembly line is possible.

Since these processes require time, and the plant is closed over weekends, it follows that they must be performed in the week prior to the Monday the components are to be used on the assembly line.

A similarity exists between the instant case and that of Eddleman v. United States, 229 F.Supp. 231 (U.S.D.C.D.Col. 1964), where the Commission concluded that there was nothing "specialized about the service which the supporting shippers require which distinguishes it from that usually afforded by motor common carriers," and that the "proposed service," therefore, was "not one designed to meet the distinct needs of each of the supporting shippers." 94 M.C.C. 81, 92–93 (1963). Here the Commission concluded that applicant has "not shown that such person [the shipper] has a distinct need for a type of service not ordinarily offered by common carriers," and that the "service proposed * * * does not dif-

fer substantially from that offered by common carriers generally." 99 M.C.C. 697 at 703. In each case the permit sought was denied and judicial review followed.

In Eddleman, as in the instant case, a perusal of the Commission's conclusions reveals that the Report does not recognize the distinction between two questions: (1) whether the supporting shipper presented evidence that it has a distinct need, and (2) whether the operation proposed by the plaintiff is designed to meet that distinct need. And as indicated in Eddleman, "[t]his distinction is crucial in the light of the philosophy" expressed in the J–T Transport case, 368 U.S. 81, 92, 82 S.Ct. 204, 211, that under the statute applicable to contract carriage "a shipper is entitled to have his distinct needs met." Upon remand of Eddleman, and consideration of the distinction between the two specified questions, the Commission reached a different result, 98 M.C.C. 681 (1965), and granted the permit.

▮ Finally, we note that the grounds for the Commission's finding of no distinct or specialized need on the part of the shipper here are not articulated in its Report. We have not found in the record as a whole anything to warrant the finding. The evidence is to the contrary.

### THE THIRD FACTOR

▮ The third factor which the Commission is required to consider under § 209(b) is the effect which granting the permit would have upon the protesting carriers.

As to this factor, the Commission concluded:

> Each of the protestants herein, except Glendenning, has participated in the traffic and would be adversely affected by any grant of authority which would divert such traffic from them. Though the shipper-consignee expects to continue to avail itself of authorized common carriers, it is evident that they would be used for the so-called small parts and that the more profitable shipments of heavier items would be

routed largely by applicant. 99 M.C.C. 697, 703.

At the hearing before the Examiner the shipper indicated effectively that if the permit sought by the applicant is denied the shipper would *not* use the existing common carrier service to transport major components but would provide its own private carriage for them. If this evidence be credited (and the record discloses no reason why it should not be credited), then whether the permit is granted or denied, the protestants would not receive such traffic. The Report of the Commission is not enlightening as to how, if at all, it considered this evidence. Circumstances which ought to be considered should not be excluded. Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288.

The shipper further indicated that if a grant of contract carrier authority *is* made to plaintiff, the shipper would use protestants and other common carriers to haul small items which can be stored in the plant in such quantities as not to necessitate the close scheduling required for the major components. If the shipper is forced by the denial of plaintiff's application to procure its own vehicles to transport the major components, there would seem to be no reason why such vehicles should not haul also the small components. Thus it may well be that the denial of plaintiff's application would prevent protestants from realizing any traffic from the shipper whereas issuance would result in at least part of the traffic being received by them.

As to the protestants having "participated in the traffic" of the shipper, the evidence is that they had not had the shipper's traffic except on an experimental basis whereby the shipper might determine whether their service could be relied upon to effect deliveries of supplies within four days of pickup, this being just after the Pembina plant had opened, and when production had hardly commenced. The limited participation of the protestants in the traffic must necessarily bear on the extent to which they may be affected by the grant of the

authority sought by plaintiff. The Report of the Commission, however, is not informative in that regard.

The guidelines for consideration of the third criterion are as follows:

If the protesting carrier was actually serving a shipper and participating in the traffic involved, the granting of a permit would divert traffic from the protesting carrier, and if this diversion would cause the services of the protesting carrier to be adversely affected to a material degree, this element certainly should be considered by the Commission. Where, however, the protesting carrier is not participating in the traffic involved, there can be no diversion of traffic and hence ordinarily there would be no adverse effect on the services of the protesting carrier. J–T Transport Company v. United States, 185 F. Supp. 838, 848 (U.S.D.C.W.D.Mo., 1960).

The fact that the protesting carriers do not presently perform the service being tendered and that the grant of the application would not divert business from them does not necessarily mean that the grant would have no effect "upon the services" of the protesting carriers within the meaning of § 209(b). But where the protestant carriers do not presently have the business, it would seem that the grant of it to a newcomer would have an adverse effect on them *only in the unusual case.* (Emphasis supplied.) I. C. C. v. J–T Transport Co., 368 U.S. 81 at page 93, 82 S.Ct. at page 211 (1961).

Since the protestants, except for the mentioned trial period, have not had the shipper's traffic, it would seem that harm to them would result in only the most unusual case according to the rationale of the Supreme Court in the J–T Transport case and here the Commission has not pointed out any circumstances which make this an unusual case.

It is stated in Hoyt Contract Carrier Application, 92 M.C.C. 189 (1963), that "under the third criterion the Commission properly may consider whether the protestants are willing and able to meet the reasonable transportation requirements of the shipper involved."

The protestants at the hearing before the Examiner represented that they have the ability as well as the willingness to meet the specialized needs of the shipper. But as already indicated, the shipper, having just opened a new plant at a new location, and being desirous of obtaining first hand knowledge of the adequacy of existing common carrier service, used all existing motor carrier service as extensively as possible and made a detailed survey of the service. The shipper tendered to the protestants a total of one hundred forty-one (141) shipments, amounting to 394,692 pounds, varying from truck load weights to minimums, over a five-month period. The analysis of the service was introduced into evidence supported by the underlying shipping documents, and it established that existing carriers could not deliver the supplies to Pembina within four days of pickup. Exhibit 31.[10]

---

10. A few examples taken from Exhibit 31 show the inadequacy of the common carrier service to provide such four-day deliveries.

A 39,000 pound shipment originated in Detroit and handled in single line service all the way to Pembina was picked up on Friday, August 9 and was not delivered at Pembina until Thursday, August 15.

A 9,600 pound shipment which started at Toledo on Monday, July 8 was split between two trailers by United Buckingham, and part of the load was delivered on Monday, July 15 and the balance of the load was delivered on Wednesday, July 17. Another shipment of 1,610 pounds from Toledo originated on Tuesday, July 9 and was not delivered until Friday, July 19. A 1,000 pound shipment from Layfayette, Indiana was picked up on Friday, June 7, and was delivered at Pembina by Hart 17 days later on June 24.

Although Hart claims it renders a prompt service on all shipments between Chicago and Pembina, Exhibit No. 31 shows a 210 pound shipment of lamps

In its Report the Commission states:

When the plant reaches its planned peak production of one bus each day for a 5-day week, the shipper-consignee desires delivery of a week's supply of parts and equipment on the fourth day after shipment from its farther-most source of supply. A study of applicant's exhibit 31 indicates that during a test of plant operations conducted for 6 months in 1963, 57 of 68 shipments delivered by Hart or United-Buckingham consumed more than 4 days in transit to Pembina from origins involved herein. 99 M.C.C. 697, 699.

Despite the showing by Exhibit 31 that the common carriers could not give the shipper a steady flow of supplies from each origin to Pembina every four days, the Commission concluded that "there is no reason to believe that the proposed service * * * could be superior in any respect to the regular, daily service available from these protestant carriers." 99 M.C.C. 703, 704. It is of no significance to the shipper that the common carriers have regular and daily service where, as here, that service does not meet the shipper's requirement of a deilvery of supplies within four days of pickup. One reason (which the Commission seems to have overlooked) for believing that the proposed service *would* be superior to that of protestants is that protestants in most cases must join their operations in a two-line haul, the inherent disadvantage of which is the unloading of the shipments and their reloading on another carrier,

thus causing delays, and sometimes misconsignments, while the proposed contract carriage for a single shipper would not involve such delays, would be flexible and keyed to expeditious deliveries to meet the shipper's special requirements.

The Commission's outlook in this case should not involve loading the scales in favor of common carriers as the Supreme Court in December 1961 expressly ruled that there is "no room for a presumption in favor of, or against, any of the five factors on which findings must be made under § 209(b)." I.C.C. v. J–T Transport Co., 368 U.S. 81 at 89, 82 S.Ct. 204. The Court further said:

By adding the five criteria which it directed the Commission to consider, Congress expressed its will that the Commission should not manifest special solicitude for that criterion which directs attention to the situation of protesting carriers, at the expense of that which directs attention to the situation of supporting shippers, when those criteria have contrary implications. (Page 89, 82 S.Ct. page 209.)

\* \* \* \* \* \*

We * * * agree that though common carrier service is reasonably adequate and though another carrier is willing and able to furnish the service, a permit to a contract carrier to furnish this particular service still might be wholly consistent with the national transportation policy * * *. The "distinct need" of the shipper may nonetheless not be served by existing services, if the new service is better tailored to fit the special re-

---

handled by Hart in single line service from Chicago to Pembina was picked up in Chicago on Thursday, June 6, and was delivered at Pembina 18 days later on Monday, June 24.

Exhibit No. 31 shows that United Buckingham picked up a 2,966 pound shipment of batteries at Minneapolis on Friday, May 31. This shipment was handled by United Buckingham in single line service, but it was not delivered at Pembina until Wednesday, June 5. A total of four working days, plus the weekend, was consumed in single line transit with no interchange delay on the

relatively short run from Minneapolis to Pembina, North Dakota.

The Exhibit shows that a 1,916 pound shipment was started on the Norwalk line at Elyria, Ohio, a point 50 miles closer to Pembina than Cleveland on Wednesday, June 5 and was delivered by United Buckingham in Pembina on Monday, June 17. A total of 12 days was consumed in transit, and the Norwalk witness testified that all shipments handled by his company from points in Ohio to Pembina by interline with other carriers are transported as rapidly as Norwalk's services will permit.

quirements of a shipper's business, the length of its purse, or the select nature of the delivery service that is desired. (Pages 92–93, 82 S.Ct. page 211.)

### THE FOURTH FACTOR

Under 209(b) the fourth factor for consideration by the Commission is the effect which denying the permit would have upon the applicant/or its shipper.

In this regard, the Commission made the following findings:

The effect of a denial of the permit upon applicant, which holds no authority in the United States and operates in the United States only as a carrier of exempt commodities, would be to confine it to its present operations; no traffic would be taken from it; and thus it would not be adversely affected.

The effect of a denial upon the supporting shipper-consignee would be to limit its choice of carriers to those presently authorized to perform and who are performing the service. As already indicated, United-Buckingham offers single-line service to Pembina from two of the origins sought herein and can, like Glendenning, act as deliverying carrier in a two-line haul from each of the other origins. On this record there is no reason to believe that the proposed service * * * could be superior in any respect to the regular, daily service available from these protestant carriers. We conclude, therefore, that the supporting shipper-consignee will be equally capable of maintaining its production schedule through the use of protestants' services as through applicant's and thus that it will not be adversely affected by a denial. 99 M.C.C. 697 at 703–704.

█ Considering all of the record, including the evidence that the alternative faced by the shipper if the application is denied is to put its own "trucks on the highways to bring major components from the various major points" so as to afford the shipper "effective control over the delivery of these materials" to meet its production schedules, it is clear that the substantive evidence does not support the Commission's finding that the supporting shipper will not be adversely affected by a denial of plaintiff's application. Likewise, the Commission's conclusion that the supporting shipper will be equally capable of maintaining its production schedule through the use of the services of the protestants as through the services of plaintiff is not supported by substantial evidence.

### THE FIFTH FACTOR

█ The fifth factor to be considered under 209(b) is the changing character of the requirements of the supporting shipper.

In that respect the Commission found:

Finally, there is nothing here to persuade us that an increase in the shipper-consignee's production at Pembina will change its requirements so as to make necessary the service of a contract carrier in lieu of its available common carrier service. 99 M.C.C. 697 at 704.

It is without dispute in the evidence that the Pembina plant is designed to produce one bus a day during a work week of five days, and that because of limited storage space it can accomodate only enough large components for five buses. This is the basis for the shipper's four-day delivery requirement.

The Pembina plant was established to meet the demand of the American market for completed buses. There is nothing in the record to reflect a future reduction of this demand or of the requirement of the shipper for the expedited delivery of supplies. If it is possible for the production of buses at the plant to exceed the planned number of five per work week of five days, then in light of the plant's limited storage space, such an increase in production would necessarily entail an even more expeditious delivery of supplies.

## CONCLUSION

It is urged by plaintiff that this Court direct the Interstate Commerce Commission to issue to plaintiff the contract carrier authority sought in its application. This we may not do. A reviewing court has no power to order an administrative body to perform discretionary acts in a particular manner, or itself to exercise administrative functions. Interstate Commerce Commission v. United States ex rel. Members of Waste Merchants' Ass'n, 260 U.S. 32, 43 S.Ct. 6, 67 L.Ed. 112; Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15; Arrow Transportation Co., et al. v. Cincinnati, New Orleans & Texas Pacific Railway Co., et al., 379 U.S. 642, 85 S.Ct. 610, 13 L.Ed.2d 550; Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561.

However, since the Commission did not properly employ the statutory procedures, and did not appropriately evaluate the requisite criteria, and made findings not supported by substantial evidence, judgment will be entered setting aside the Report and Order of the Commission, and remanding this case for the further consideration of the Commission consistent with this opinion.