SUPERIOR TRUCKING COMPANY, Inc., Eagle Motor Lines, Inc., Colonial Fast Freight Lines, Inc., Tom Hicks Transfer Company, Inc., and J. H. Rose Truck Line, Inc.,

v.

The UNITED STATES of America and

The Interstate Commerce Commission and

Diaz Motor Freight, Inc., Intervenor-Defendant. (per order of 9-12-69).

Civ. A. No. 13060.

United States District Court N. D. Georgia, Atlanta Division.

Nov. 20, 1969.

E. Stephen Heisley, Harry C. Ames, Jr., of Ames, Hill & Ames, Washington, D. C., Frank D. Hall, Guy H. Postell, Archie B. Culbreth, Atlanta, Ga., for Superior Trucking Co., Inc., Eagle Motor Lines, Inc., Colonial Fast Freight Lines, Inc., Tom Hicks Transfer Co., Inc. & J. H. Rose Truck Line, Inc., James M. Doherty, Morgan Nesbitt, Austin, Tex. (of counsel for Tom Hicks Transfer Co. & J. H. Rose, etc.), Robert M. Pearce, Bowling Green, Ky. (of counsel for Eagle Motor Lines, Inc.).

Fritz R. Kahn, Deputy Gen. Counsel, I.C.C., Washington, D. C., for defendant.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., Croft & Dail, Washington, D. C., for Diaz Motor Freight.

Before MORGAN, Circuit Judge, HOOPER and EDENFIELD, District Judges.

EDENFIELD, District Judge:

Plaintiffs, Superior Trucking Company, Inc., Eagle Motor Lines, Inc., Colonial Fast Freight Line, Inc., Tom Hicks Transfer Company, Inc., and J. H. Rose Truck Line, Inc., common carriers seek to set aside and annul an order of the Interstate Commerce Commission approving the issuance of a certificate of public convenience and necessity to Diaz Motor Freight, Inc. to transport "iron and steel articles" as a common carrier over irregular routes, from New Orleans to points in Arkansas, Alabama, Georgia, Louisiana, Mississippi, Tennessee, and Texas.

Diaz began interstate operations in May, 1966, under emergency contract carrier authority which permitted it to transport reinforcing steel in 30,000-pound minimum loads for Armco Steel Corporation from New Orleans to a point near Gainesville, Mississippi. This temporary authority was extended but after its expiration in March, 1967, Diaz obtained additional contract carrier temporary authority, on August 6, 1967, which, by an order of February 6, 1968, was extended to expire upon determination of the permanent common carrier applica-tion considered in the instant action. Under this temporary authority, Diaz transported wire mesh and structural and reinforcing steel as a contract carrier for Primary Steel, Inc., Atlas Steel & Wire Corporation, and Southeast Steel and Wire Corporation, from New Orleans to points in Arkansas, Alabama, Florida, Georgia, Mississippi, Tennessee, and Texas. On June 24, 1968, following three days of hearings, from May 27 through May 29, 1968, Diaz was granted additional temporary authority as a contract carrier for Laclede Steel Company in the same states mentioned above, with the exception of Texas. Prior to the instant action, Diaz' only permanent authority consisted of intrastate common carrier operations for the transportation of structural and reinforcing steel, heavy machinery, agricultural products, and naval stores.

In its application, Diaz stated that it preferred to receive permanent common carrier authority for iron and steel articles, but would accept permanent contract carrier authority as an alternative. The Hearing Examiner and the Commission treated the application as one for common carrier authority.

After lengthy hearings, the Hearing Examiner, in an extended opinion, recommended the issuance of common carrier authority to ship iron and steel articles from New Orleans to points in all states sought by Diaz, with the exception of Louisiana and parts of Florida. The Commission adopted, with one modification, the decision of the Hearing Examiner granting the certificate. Its only modification was a broadening of the common carrier certificate to permit Diaz to transport goods in interstate and foreign commerce from New Orleans to points in Louisiana, a service denied by the Examiner.

Protestants launch a broadside attack on the Commission's decision. They urge that the Commission relied on vague, inadequate, and inconsistent findings; that it erred in concluding protestants' operations would not be materially affected

by Diaz' certificate; that the Commission applied contract carrier standards under 49 U.S.C. § 303(a) (15) rather than common carrier requirements under 49 U.S.C. § 307; that no consideration was given to the adequacy of existing service; and that the grant of authority to serve Louisiana was inconsistent with their affirmance of the Hearing Examiner's limitation of service in Florida.

■■■ In considering plaintiffs' objections, we must be guided by the standard of judicial review set out in the Administrative Procedure Act, 5 U.S.C. § 1009(e), requiring "substantial evidence" on the record as a whole. Substantial evidence is something less than the weight of the evidence, Short Line, Inc. v. United States, 290 F.Supp. 939, 941 (D.R.I.1968). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commission's finding from being supported by the requisite substantiality. Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L. Ed.2d 131 (1966). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Again, the Supreme Court has stated that "substantial evidence * * * must do more than create a suspicion of the existence of the fact to be established. * * * [I]t must be enough to justify, if the trial were to a jury a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

Common carrier grants are governed by 49 U.S.C. § 307(a), which provides, in pertinent part, that:

" * * * [A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied * * *."

In order to sustain its burden of proof before the Commission, Colorado-Arizona-California Express, Inc. v. United States, 224 F.Supp. 894 (D.Colo.1963), applicant Diaz had six supporting shippers testify on its behalf. A close examination of their testimony, and the extensive, detailed conclusions drawn from it by the Hearing Examiner, adopted by the Commission, indicates to the Court that substantial evidence exists to support issuance of common carrier authority to Diaz.

The supporting shippers manufacture or distribute a wide range of items. Primary Steel, Inc., manufactures and/or distributes steel wire mesh, and several items in the structural steel family, including angles, bars, channels, plates, beams, pipe, tubing, castings, wire rods and other steel articles and accessories. Laclede Steel Company fabricates reinforcing steel bars and distributes wire mesh and certain accessories associated with wire mesh. Atlas Steel and Wire manufactures steel reinforcing wire mesh and distributes reinforcing bars and rods, foundation bolts, tie wire, nails, fence wire and barbed wire. Armco Steel Corporation, another supporting shipper, fabricates reinforcing steel, distributes wire mesh, coiled steel, and certain other steel articles used principally to reinforce concrete. Southeast Steel and Wire Corporation produces steel reinforcing mesh and distributes items such as reinforcing bars, nails, bale ties and foundation bolts. And Orleans Material and Equipment Company fabricates steel and distributes such steel articles as angles, bolts, nuts, channels,

columns, beams, girders, plates, gratings, and reinforcing bars.

The testimony of these shippers, thoroughly reviewed and recited by the Hearing Examiner, bears eloquent testimony to the need for additional common carrier service.

First, it is clearly established in the record that the supporting shippers prefer to ship their wire mesh in the wire mesh semitrailers provided by only Diaz. The shippers favor the Diaz semitrailer for wire mesh shipments due to its ease of loading, its safety in transit, and the economies involved in being able to load 30,000 pounds of wire mesh rolls onto it. None of the protestants have wire mesh semitrailers. *See, e. g.,* Laclede's testimony at Tr. 200DD–EE; Atlas' testimony at Tr. 254, 257, 260, 261, 264, 267–268, 273, 275; Southeast's testimony at Tr. 297.

Second, the protestants often were unable to supply standard equipment when required by the supporting shippers, including such equipment as conventional flatbeds, or other equipment which they had in their service. *See* Primary's testimony at Tr. 131, 149, 160, 168, 169, 177, 188–189; Laclede's testimony at Tr. 200CC; Southeast's testimony at Tr. 294–295; Armco's testimony at Tr. 322, 323, 329, 343; Orleans' testimony at Tr. 362, 364–365, 389.

Third, the supporting shippers were often met by frustrating delays in service by protestants, when, as often, time was of the essence to their consignees, particularly on construction work where cranes and crews are ready at specific times for unloading. Dissatisfaction with protestants' service was also voiced for other reasons. *See,* Primary's testimony at Tr. 150, 159, 187, 199; Laclede's testimony at Tr. 221–222, 224; Armco's testimony at Tr. 324–325, 342; Orleans' testimony at Tr. 372–373, 374, 375 (driver inexperience), 376, 381, 385, 400C.

Fourth, Diaz, unlike protestants, could be depended upon by the shippers to spot its trailers and permit loads to remain on trailers overnight. This service was considered important by the supporting shippers. *See,* Laclede's testimony at Tr. 214–215, 217–218, 223; Southeast's testimony at Tr. 298; Armco's testimony at Tr. 326, 327; Orleans' testimony at Tr. 367. Among other services performed by Diaz, valuable to the shippers, were multiple stops en route for partial delivery and unloading. *See, e. g.,* Armco's testimony at Tr. 327.

■ Plaintiffs object that the common carrier certificate issued to Diaz permits shipment of "iron and steel articles", and allegedly broader category than the evidence warrants. The court cannot agree. While much of the testimony dealt with the shipment of wire mesh and over-length structural steel, the shippers ship a broad range of items. Their testimony, reviewed above, indicates graphically that they often needed standard equipment to ship several items in the "iron and steel articles" category. *Indianhead Truck Lines, Inc. v. United States,* 253 F.Supp. 186 (D.Minn.1966). While the supporting shippers often spoke of shipping structural steel, this broad generic term includes many items which the Commission considers to be within the iron and steel group, such as coiled rods, angles, bars, beams, bolts, castings, channels, columns, girders, gratings, joists, nails, nuts, pipe, plates, strip, ties, trusses, and tubing. *See* Appendix V, at 61 M.C.C. 209. Moreover, the Commission, in granting a broad certificate, does not require that an applicant establish a need as to each, for this would impose a burden few could surmount. Only a representative number of items in a category are necessary to establish a need for a grant covering a broader group including those representative items. As the Commission put it in *Fox-Smythe Transportation Co. Extension—Oklahoma,* 106 M.C.C. 1, 27–28 (1967):

"While grants of commodity authority may be only as broad as is supported by the record, it must be recog-

nized that there are numerous difficulties in precisely establishing a need for each and every commodity embraced in a wide class. Generally, in order to receive a broad grant, it must appear that a representative number of commodities belonging to a particular class will be shipped, but it need not appear that the supporting shipper requires transportation of every item in the class."

The Commission has established a policy of favoring broad commodity descriptions, such as the one given Diaz here, in order to provide comprehensive service to an industry and to avoid the need for recurrent extensions of an original narrow grant. As the Commission put it:

"As a general policy, this Commission favors the use of broad commodity descriptions where a carrier serves a particular class of shipper. * * * While a prerequisite for a grant of broad commodity authority is the requirement that there be a need to transport a representative number of commodities, this Commission's practice has been to frame grants which will enable carriers serving a particular industry to render that industry a complete transportation service when appropriate.

\* \* \* \* \* \*

"Where a commodity description which is broad in scope is necessary to enable an applicant to render a complete and integrated service to the shipper and to meet that shipper's present and reasonably forseeable future transportation needs, a broad commodity classification will be granted in practical terms in the interest of simplicity and reasonable regulation in appropriate cases." *Fox-Smythe*, supra, at 28–29.

The importance of this broad-grant policy is vividly evident in the instant action. The shippers ship a broad range of steel items. To limit Diaz' certificate to wire mesh and over-length structural steel would be to prohibit Diaz from pro-

viding a comprehensive service to the industry. Thus, for example, several supporting shippers indicated that they frequently send their wire mesh shipments, which Diaz is so peculiarly equipped to handle, in mixed loads with other steel articles. *See*, Primary's testimony at Tr. 167, 191; Atlas' testimony at Tr. 245; Southeast's testimony at Tr. 296. Under its broad grant, Diaz will be able to carry the other iron and steel articles manufactured or distributed by the shippers, along with the wire mesh.

Plaintiffs also urge, as noted earlier, that contract carrier standards were employed in determining public convenience and necessity for the common carrier grant extended to Diaz. They state that the Commission's reliance on the specialized service and equipment available from Diaz indicates utilization of contract carrier criteria, under 49 U.S.C. § 303(a) (15) (b):

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation * * * under continuing contracts with one person or a limited number of persons * * * (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

It is clear that there is a distinction between the criteria employed for contract carriage under § 303(a) (15), and that used for common carriage, under § 307(a). National Trailer Convoy, Inc. v. United States, 293 F.Supp. 634 (N.D.Okl.1968); Midwest Truck Lines, Ltd. v. ICC, 269 F.Supp. 554 (D.D.C.1967); Erskine & Sons, Inc. v. United States, 235 F.Supp. 907 (W.D. Pa.1964); ICC v. J–T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961). We cannot agree, however, that the Commission veered from common carrier standards. In establishing the inadequacy of existing service, which is an important element in determining public convenience and necessity under

§ 307, Curtis, Inc. v. United States, 225 F.Supp. 894 (D.Colo.1964), aff'd., 378 U.S. 128, 84 S.Ct. 1658, 12 L.Ed.2d 744; Watkins Motor Lines, Inc. v. United States, 243 F.Supp. 436 (D.Neb.1965); Lester C. Newton Trucking Co. v. United States, 264 F.Supp. 869 (D.Del.1967), aff'd., 389 U.S. 30, 88 S.Ct. 108, 19 L.Ed. 2d 29, the Commission correctly looked at whether the plaintiffs' equipment was satisfactory for the shippers' needs. The equipment furnished by Diaz was no more highly specialized than some of the equipment available to the protestants. While none of the carriers had wire mesh trailers, they employed sophisticated equipment in an attempt to meet the needs of steel shippers. Thus, for example, the plaintiffs maintained such equipment as reinforced flatbed semitrailers, pole trailers, lowboy semitrailers, low-bed drop-frame semitrailers, headache racks, of both the cradle and I-beam type, expandable trailers, flatbeds with sliding units underneath for adjusting weight distribution, telescopic trailers, converta vans, drop-frame and drop-back vehicles, trailers with removable sideboards, and fork-lifts and cranes. The equipment available from Diaz was not specifically tailored for the specific and individualized needs of the shippers. The mere availability of sophisticated equipment cannot keep a carrier from receiving common carrier authority. Moreover, as shown above, the Commission indicated that existing carriers were not supplying either adequate service or standard equipment on numerous occasions. Equally important, the services performed by Diaz could have been, and to some extent were, performed by common carriers. P. Saldutti & Son, Inc. v. United States, 210 F.Supp. 307 (D.N.J. 1962); Texas Mexican Ry. v. United States, 250 F.Supp. 946 (S.D.Tex.1966).

■ Another issue raised by plaintiffs is whether the Commission acted inconsistently in affirming the Examiner's limited grant of authority to serve Florida, while reversing the Examiner and permitting Diaz to serve points in Louisiana. Protestants do not question either decision in and of itself, but contend that taken together they reach inconsistent results on the same evidence. Of course, the Commission may reject all or part of the Examiner's findings, if it does so on consistent grounds, supported by substantial evidence in the record as a whole. Sinett v. United States, 136 F.Supp. 37, 40 (D.N.J.1955). The Commission, after adopting the findings in the Examiner's decision, stated, by way of modification, that "inasmuch as two of the supporting shippers herein, Primary Steel, Inc., and Armco Steel Corporation, have shipments in interstate and foreign commerce from New Orleans, La., to points in Louisiana, authority to transport those shipments will be herein granted." It is obvious from the Commission's language that its extension of the proposed service was based upon the recognition, not noted by the Examiner, that some shipments from New Orleans to other points in Louisiana would be interstate in nature, due to their foreign or out-of-state origin or shipment. The record bears out the Commission's finding. See Tr. at 123–124, 192, 369. The evidence regarding Florida was not identical. The record indicates that the shippers shipped only into the panhandle section of Florida but moved traffic to numerous locations throughout the State of Louisiana. See, e. g., Tr. at 115. Protestants make out no fatal inconsistency in the record.

■ Yet another issue raised by plaintiffs has to do with the Commission's finding that "the partial grant of authority set forth in the finding will [not] impair the operations of the existing carriers." We cannot agree with plaintiffs that the Commission erred in this conclusion. The implementation of a new common carrier service may well inject an additional competitive element into plaintiffs' business, but this in itself affords no grounds for refusal to grant the certificate or it would be difficult to ever secure a certificate for new service. Atlanta-New Orleans Motor

Freight Co. v. United States, 197 F.Supp. 364, 370 (N.D.Ga.1961); Vincent Montone Transportation, Inc. v. United States, 231 F.Supp. 484 (M.D.Pa.1964). Moreover, Diaz' rates are higher than those charged by plaintiffs, due in part to its authorization for only one-way operation from New Orleans, requiring an empty return haul. *See, e. g.*, Tr. at 156, 167, 179, 200. Shippers will usually turn to Diaz only when existing carriers are unable to handle their needs. Additionally none of the plaintiffs is largely dependent upon the business of any of the supporting shippers and each is highly successful at this time. The maximum net operating revenue which protestants are likely to lose, even assuming that all of the traffic they now handle from New Orleans was diverted to Diaz, would be small. Therefore, it does not appear plaintiffs will be greatly prejudiced by Diaz' entrance into the common carrier arena.

Last, plaintiffs argue that the Commission's findings are inadequate and incomplete. We disagree. The Examiner made specific findings, adopted by the Commission, on the major issues necessary to a finding of public convenience and necessity, under § 307(a) of Title 49. The findings are adequate to inform the court of the basis of the ultimate conclusion reached. Minneapolis & St. Louis R. R. v. United States, 361 U.S. 173, 193–194, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); Younger Brothers, Inc. v. United States, 238 F.Supp. 859 (S.D.Tex.1965).

In short summary, substantial evidence exists in the record as a whole to indicate that Diaz is willing and able to perform the shipment of "iron and steel articles" from New Orleans to the points indicated in the certificate, and that the proposed service is required by public convenience and necessity. Plaintiffs' objections are overruled, and their motion to set aside the Commission's findings is denied. The Commission's grant of common carrier authority to Diaz is affirmed.